## BOTHWELL, et al. v. WAY et al.

No. 3897.   Opinion Filed November 24, 1914.

Rehearing Denied January 9, 1915.

(145 Pac. 350.)

**APPEAL AND ERROR—Marriage—Judgment—Conflicting Evidence —"Common-Law Marriage."** To constitute a valid common-law marriage, it is necessary that there should be an actual and mutual agreement to enter into a matrimonial relation, permanent and exclusive of all others, between parties capable in law of making such a contract, consummated by their cohabitation as man and wife, or their mutual assumption openly of marital duties and obligations. And in an action where it is necessary to determine the issue whether such actual agreement was entered into and whether there was a matrimonial relation maintained between them, permanent and exclusive of all others, or whether they maintained a continual living together as man and wife, or openly assumed mutual duties and obligations towards each other as man and wife, and where there is a conflict in the testimony as to facts which go to show whether or not the parties actually maintained those marital duties and obligations required by the common law, the judgment of the trial court upon such facts will be given the effect of a verdict of a jury upon conflicting testimony, and, if reasonably supported by the evidence, will not be disturbed in this court.

(Syllabus by Harrison, C.)

*Error from Superior Court, Muskogee County;*
*Farrar L. McCain, Judge.*

Action by Thomas J. Way and others against E. C. Bothwell and others, to cancel deeds and remove cloud from title. Judgment for plaintiffs, and defendants bring error. Affirmed.

*N. A. Gibson, H. C. Thurman,* and *T. L. Gibson,* for plaintiffs in error.

*N. B. Maxey* and *J. F. Brett,* for defendants in error.

Opinion by HARRISON, C.   This action was begun in May, 1911, by Thomas J. Way, Irvin Blanchard, and D. S. Squires, a minor, suing by J. F. Brett, her next friend. The plaintiffs alleged that they were owners of and in possession of a certain 160-acre tract of land situated in Muskogee county,

and that E. C. Bothwell had what purported to be a deed of conveyance from defendant Thomas Brown and his wife to the same tract of land, and that such deed was a cloud upon plaintiffs' title, wherefore they prayed the cancellation of same and for an injunction against defendants from claiming any interest under such deed and from interfering with plaintiffs' possession of the land. And for further cause of action plaintiffs alleged that they were the owners and in possession of the land described by virtue of title acquired thereto from the heirs of Cita Barnett, a deceased Creek Indian woman, to whom, in her lifetime, the land had been allotted. Defendants answered, denying generally and specifically each and every allegation in plaintiffs' petition, and by way of cross-petition alleged that they were the owners of and entitled to the possession of an undivided one-half interest in the land in question by virtue of a warranty deed from Thomas Brown, who, it was alleged, was the surviving husband of Cita Barnett, deceased. Plaintiffs replied, denying that Thomas Brown was or ever had been the husband of Cita Barnett, denying that he had any interest or title whatever in the said land, and charging defendants with conspiracy to cloud plaintiffs' title. The case hinged upon the question whether Thomas Brown was in fact the husband of Cita Barnett. A number of witnesses were introduced for the purpose of showing that he was her husband, and a number introduced for the purpose of showing that he was not. After hearing the testimony of both parties, the court decided that Brown was not the husband of deceased, and rendered judgment in favor of plaintiffs, decreeing the cancellation of the deed from Thomas Brown to E. C. Bothwell, and from such judgment and decree the defendants appeal.

It is claimed by plaintiffs in error that but one material question is involved, and that is whether Thomas Brown was Cita Barnett's husband. We fully agree with counsel that this is the decisive question involved. If he was her husband and entitled to one-half of her estate under the law of descent and

distribution then in force in the Creek Nation, then a deed from him to E. C. Bothwell of his undivided one-half interest in her allotment was valid, and the court was in error in decreeing the cancellation of same. But if he was not her husband, and had never been legally married to her, nor acquired any interest or title to her allotment through other sources, then the deed from him to Bothwell conveyed no title, and the court was not in error in decreeing its cancellation.

Evidence was introduced by defendants tending to show that a common-law marriage relation existed between Thomas Brown and Cita Barnett, and evidence was introduced by plaintiffs for the purpose of showing that no such relation existed. Plaintiffs in error, defendants below, contend that they showed conclusively by positive testimony that Thomas Brown and Cita Barnett entered into a marriage contract according to the Creek tribal customs, and afterwards, up to the time of her death, maintained the relation of husband and wife, and that the contract entered into between the parties, and the relations thereafter maintained between them, were sufficient to constitute a common-law marriage. It is further contended by plaintiffs in error that the testimony of plaintiffs for the purpose of showing that they were not married was all of a purely negative character which did not, as a matter of law, in any wise weaken the effect of the positive testimony introduced by defendants. On the other hand, it is contended by defendants in error that the testimony introduced by them for the purpose of disproving such marriage was not of a purely negative character, but strongly tended to show that the parties were never married, and that no marriage relation between them was ever maintained, and that the trial court having heard the testimony of the respective parties, and upon same decided in favor of plaintiffs, the judgment had the effect of a verdict of a jury upon conflicting testimony, and, being reasonably supported by evidence, should not be disturbed by this court. These contentions necessitate an examination of the testimony.

On behalf of the defendants, Thomas Brown testified that he and Cita Barnett were married about the month of May, 1899; that she died some time in February, 1900; that they had lived together about a year and a half, and that she was his wife when she died; that she died at Old Man Snow's; that a child was born dead; and that she lived something over a day and a half before she died.

Melissa Pence, who was a cousin of Tom Brown's, and whose first husband was Johnson Barnett, stated that Tom and Cita came to her house and both told her they were married; that they stayed there one night and occupied the same bed. She said: "They came over there to stay all night, two days, and went on back." She did not say to where they went back She also said they lived together a long time, over a year. To the question, "How did the family consider them?" she answered:

"I don't know? Q. Did they consider them married or not? A. Yes, sir; I think so."

She also testified that about three months after they were at her house she saw them together at Susana Barnett's.

George Brown, the father of Thomas Brown, testified that Tom and Cita were married. They lived together about a year. In answer to the question, "How did they happen to get married?" he said:

"Well, George Barnett, Cita Barnett's father, came to my house and talked to me about Cita and Tom being so they could get married, and George Barnett told me that it would be well if Tom and Cita were married to live together and support each other. According to the Indian customs, if the parents were willing for the children to be married, it always has been good, and George Barnett said to me that he was willing to let them get married."

He further testified: That he left it to Barnett to talk to these young people, and never knew any more about it until they were together. That he never saw either of them for a long time until Cita and Tom came up to his house. When they

came to his house they said nothing about being married, when they left—they stayed all night—and when they left they left together.

Daniel Pickett testified that he was a cousin to George Barnett; that George Barnett came up to his house and told him that he and George Brown had agreed that Tom and Cita should be married. He also testified that he saw them together after that; that they sometimes used to come up to his house; that they stayed all night there sometimes.

Legus Brown, a brother of Thomas, stated that he knew that Tom and Cita lived together over there southwest of Bristow at George Barnett's house.

"Q. Did Tom and Cita stay at your father's house a long time? A. Only when they came there and stayed overnight. Q. Do you know how your family regarded them, as to whether or not they were married? A. I don't know,"

He did not state how often they were at his father's house, nor whether more than once, but stated that when they were there they occupied the same bed.

This is the substance of the revelant testimony offered by defendants in support of the marriage.

In support of plaintiffs' contention that no marriage relation existed, Billy Barnett testified that he was 52 years of age; that he was a brother to George Barnett and first cousin to George Brown; that he knew Tom Brown and Cita Barnett. He testified as though he had known them all their lives; that he lived there in that country; that he had never seen them together during the time it is claimed they were living together as man and wife. He said:

"I did see him come up there once or twice, but he went back the same day. He was staying at Johnson Barnett's at the time. Q. Did you ever have any conversation with George Barnett about Tom Brown and Cita and their relationship? A. Yes, sir; because we all knew they were close kin, were cousins' children. Q. Ask him if he ever had any conversation with

George Barnett about Cita and Tom Brown marrying? A. No, sir; I never, because they was too close kin. Q. If two persons were nearer relation than third cousins, could they marry under the Creek custom? A. No, they could not marry either second and third. Q. Under the custom and understanding of the Euches, what relation would Tom Brown and Cita be? A. They would call each other brothers, under the Indian custom. Under the ways of the Indians they call their cousins sisters and brothers just the same as if they were own sisters. Q. Could sisters and brothers get married? A. No, sir; the old people during that time wouldn't allow such as that. Q. Is that one of the reasons why you know Tom Brown and Cita were not married? A. I never thought of them being married that way at all. Q. Did George Barnett ever say anything to you about Cita and Tom being intimate, and was apparently mad about it? (This question was objected to but finally admitted.) A. I don't know whether they were in that condition or not. They used to talk to each other, but I thought they talked to each other because they were acquainted."

Jesse Allen testified that he was an Euche Indian, 59 years old, and had lived in the Creek Nation all of his life; that he knew George Brown and George Barnett; that they were first cousins, being children of two sisters; that he lived close to George Barnett; that he knew Tom and Cita; that he did not know anything about their being married; that he had never heard any of the family say anything about their being married. In answer to the question, "Did they live together?" He said:

"Why, Thomas, when he got out of jail, he went back up in there and was staying around George's place with the folks and it wasn't long before he moved off down here at Haskell. Q. Did you hear any of the family or any of them say anything about Thomas and Cita being married? A. No, sir; I did not. Q. When was it that Tom came back from the penitentiary; how long before Cita's death? A. Why, I don't know just exactly but it was, I don't think, very long—a short time."

In answer to the question whether or not the Euche Indians permitted the marriage of close relations, he said:

"Their custom was that they never married their close relation. If they were cousins they claimed brother and sister-

ship.   Q. How about third cousins, could they marry? A. No, sir."

Melissa Johnson, sister of Cita Barnett, nineteen years old, testified that she knew Tom Brown and had never heard her family say anything about Cita and Tom being married.

Jeannetta Johnson, another sister, twenty-three years of age, testified that when Cita died she was living with her auntie at Kelleyville; that she was then in school; that when she left school Cita was at home with her father; that Tom Brown was not living there. In answer to the question, "Did you know Tom Brown at that time?" She said:

"Yes, sir; I have known him, but he never did marry her. Q. Well, did you ever hear anything said in the family about Tom and Cita being married? A. No, sir."

Jacob Roland, a Euche Indian, 26 years of age, stated that he had known the families of the parties all his life; lived in a quarter of a mile of his grandmother's house, where George Barnett most of the time made his home; that his family was with him and would move with him back and forth to and from his grandmother's; that Cita made her home with him; that he had known her intimately for the last year or two before her death; that he was well acquainted with Tom Brown; that he lived about with his father and the rest of his kin folks; that Tom Brown did not live with George Barnett and his family; that he never heard any of the family say anything about their being married; that he would have seen them together if they had been man and wife; that he saw Cita nearly every day; that he would see Tom every month or so; stayed at his cousin's house and would see him visiting around; that he was intimate with the family and visited them frequently and never heard any of the family say anything about them being married.

Thomas Way, one of the plaintiffs, 53 years old, testified that he had lived in that country about 30 years and in that immediate country 26 years; was well acquainted with George Barnett's

family; was about his place frequently; that he was well acquaint-
ed with Cita Barnett; that during the years 1898, 1899, 1900, she
lived with her father, part of the time, however, with her aunt,
Susana Barnett; that he knew Tom Brown. In answer to the
question, "Did you see him about George Barnett's or where
Cita was during these years?" he said.

"No, sir; I never saw him with the family at all. He stayed
a while with his brother as he testified here, and at Jackson
Barnett's, and I think about the time Cita died, or just before
Cita died, I can't recall just exactly."

He further testified that he had never heard any of the
family say anything about Cita and Tom being married; that he
had been leasing the land in question since about 1898, and had
been in possession of same during the time; that he had leased
Cita's land from her father, George Barnett, until after his death,
and then from Billy Barnett, as guardian of the children; that
he had been in possession of same through George Barnett, and
then after his death through the guardian of George's children;
that as the children had attained majority he had bought the
interests of all the heirs, except two, one of whose interests Mr.
Blanchard had bought, and the other one, Della S. Squires, had
never sold her interest yet, during all of which time Tom Brown
had made no claim to the allotment nor made any demand for
any of the rents therefrom.

This is the substance of all the testimony offered in relation
to the marriage.

It is contended by plaintiffs in error that the Arkansas
statutes on marriage and divorce were in force in the Indian
Territory at the time of this alleged marriage, and is contended
by defendants in error that the Creek law was in force at the
time, but it is unnecessary to decide these questions, as it is very
clear under the evidence that, if there was a marrige contract
at all, it was not made under either of the above laws. The
question, then, is whether, under all the testimony, there was
sufficient evidence to sustain the contention of a common-law

marriage. We are unable to say what our views might have been, had we occupied the position of juror or trial judge, and it would probably be inappropriate to express our views of the weight of the testimony here, inasmuch as we did not see the witnesses nor hear them testify. It is true, as contended by plaintiffs in error, that the testimony in support of the marriage contract and of marriage relations between the parties was positive, while, on the other hand, the testimony of defendants in error was in a measure of a negative character. But an examination of the testimony shows that although Tom Brown testified positively that he and Cita Barnett were married, and that their marriage agreement between them was made out in the field at the time Cita came to the place where he was plowing, yet he is not corroborated on this point by any other witness. It is true also that George Brown, his father, testified that Tom and Cita were married, but an examination of his testimony discloses that he knew nothing about it, except from hearsay. The testimony shows that George Barnett, Cita's father, came to him and talked about Tom and Cita getting married, and expressed a willingness in that regard, but George Brown stated that he left the whole matter to George Barnett to arrange, and did not know anything about it until he afterwards heard that they had agreed to get married. This is all the testimony—the positive testimony—as to the fact that they did agree to get married. This testimony shows clearly that such contract or agreement, if made at all, was not made in accordance with either the Indian laws or the Arkansas laws on marriage, and under all the testimony submitted, viewed in the light of their subsequent conduct and relations towards each other, we do not feel justified in saying the court erred in holding that it was insufficient to constitute a common-law marriage. As to their conduct and relations towards each other subsequent to the alleged agreement to marry, Melissa Pence, a cousin of Tom Brown, stated that Tom and Cita came to her house and told her that they were married; that they stayed there two days and a night and occupied the same bed; that some three

months after this she saw them together again at Susana Barnett's. George Brown, the father of Thomas Brown, testified that they lived together, but an examination of his testimony shows that their living together was a mere supposition or assumption on his part; that as a fact he did not personally know. Daniel Pickett testified that George Barnett told him that he and George Brown had agreed for Tom and Cita to get married; that he afterwards saw them together; that they sometimes came to his house and sometimes stayed all night. Legus Brown, a brother of Tom's, stated that Tom and Cita lived together over there southwest of Bristow at George Barnett's house, but several other witnesses, near neighbors and members of Barnett's family, testified that they did no such thing. Legus Brown also testified that he did not know whether the family considered them married or not.

On the other hand, Billy Barnett, a cousin of George Barnett, an Indian who had lived there most of his life and knew the family of both Tom and Cita, testified that he had never seen them together, except that he had seen Tom come up there once or twice, but he went back the same day, and said that he (Tom) stayed at Johnson Barnett's at the time. Jesse Allen, another Indian of the Euche Tribe, testified: That he knew the families well, and in answer to the question, "Did they live together?" said:

"When Tom got out of jail he went back up there and stayed around awhile, but not long before he moved off down at Haskell."

That he had never heard any of the family say anything about them being married. Jacob Roland testified that he had lived within a quarter of a mile of his grandmother's during the time of the alleged marriage relation, and that George Barnett most of the time made his home with Roland's grandmother, and that Cita made her home with her father, and that Tom during the time made his home with his father and the rest of his kin folks and did not live with George Barnett and his

family; that he had never heard any of the family say anything about their being married; that he saw Cita nearly every day. He saw Tom every month or so. Thomas Way testified practically to the same effect. He also testified that Melissa Pence told him that Tom and Cita were never married, but Melissa Pence denied making this statement. Two of Cita's sisters and one of her brothers testified that they had never known of Tom and Cita living together as man and wife, and never heard any of the family say anything about their being married, and one of the sisters, Jeanetta, testified that Tom never did marry her. George Barnett and his wife, Cita's father and mother, were dead at the time of this trial.

Now, while the testimony of plaintiffs in error on its face is positive in character, yet when viewed in the light of the admitted lack of opportunity of the witnesses to know what they were testifying to (that is, to have personal knowledge of the facts to which they were testifying), their testimony is not of that positive character to render it absolutely conclusive. It is also true that the testimony of defendants in error's witnesses was in some measure of a negative character, but in many instances they testified to facts from which valid inferences might be drawn.

As to what constitutes a common-law marriage, Mr. Greenleaf, in section 107, vol. 1 (15th Ed.), says:

"It is frequently said that general reputation is admissible to prove the fact of the marriage of the parties alluded to, even in ordinary cases, where pedigree is not in question. In one case, indeed, such evidence was, after verdict, held sufficient *prima facie* to warrant the jury in finding the fact of marriage, the adverse party not having cross-examined the witness, nor controverted the fact by proof. But the evidence produced in the other cases cited in support of this position cannot properly be called hearsay evidence, but was strictly and truly original evidence of facts from which the marriage might well be inferred, such as evidence of the parties being received into society as man and wife, and being visited by respectable families in the

neighborhood, and of their attending church and public places together as such, and otherwise demeaning themselves in public and addressing each other as persons actually married."

In 26 Cyc. 837, the essentials of a common-law marriage are defined as follows:

"All that is required is that there should be an actual and mutual agreement to enter into a matrimonial relation, permanent and exclusive of all others, between parties capable in law of making such a contract, consummated by their cohabitation as man and wife, or their mutual assumption openly of marital duties and obligations."

Now, in order to bring the relations between Tom Brown and Cita Barnett within the rule, *supra,* it is argued by plaintiffs in error that the testimony of Thomas Brown, Melissa Pence, George Brown, Daniel Pickett, and Legus Brown conclusively shows that Thomas Brown and Cita Barnett were received as man and wife and visited by respectable members of their Indian society, and that they appeared together publicly as man and wife; that Thomas Brown and Cita Barnett told their friends that they were married, occupied the same room and bed, appeared in public as man and wife; and that Thomas Brown worked all the time like a man to make a living for Cita. We cannot agree with plaintiffs in error that the testimony of the foregoing witnesses shows the facts which plaintiffs in error contend it shows. It does not appear from the testimony of any witness in the record that Tom and Cita ever appeared together in public, at church, or at any other public gathering. The only testimony as to their being together at any time by witnesses who knew the facts was testimony of their being together one or two nights once in a great while. There is no testimony that he ever told any of his friends that Cita was his wife, except his counsin Melissa Pence. Even his father testified that at the time they stayed all night together at his house they said nothing about being married, but slept together that night, and went away together the next day. Neither is there any testimony that they ever any time claimed any one particular place as their common home,

nor is there any testimony that they were ever visited by any of their friends or relatives, or ever invited any one to visit them, or had or claimed any common house to which friends could be invited. Nor is there any testimony that Tom ever contributed one penny's worth to Cita's support. Nor is there any testimony that Cita was ever known or recognized or referred to by her relatives and lifetime friends and acqaintances by any other name than Cita Barnett, while her other sisters and Melissa Pence were invariably referred to under the name their husbands bore. It is also a significant fact that not one of Cita's brothers or sisters, nor one of their disinterested neighbors who had known them all their lives, had ever heard of their being married, or even claiming to be married. Under this state of facts, we do not feel that we could soundly say, as a matter of law, that the trial court erred in holding that the marriage relation had not been shown. These facts were all before him, and he had better opportunities for weighing them and for judging the credibility of the witnesses than we have, and we cannot feel justified in reversing the judgment.

The judgment, therefore, should be affirmed.

By the Court: It is so ordered.