Alan Leroy **FULBRIGHT**, Appellant,

v.

The **STATE** of Oklahoma, Appellee.

No. A–17130.

Court of Criminal Appeals of Oklahoma.

March 28, 1973.

Lampkin, Wolfe, Burger, Abel, Mc-Caffrey & Norman, Oklahoma City, for appellant.

Larry Derryberry, Atty. Gen., Jeff L. Hartmann, Asst. Atty. Gen., for appellee.

OPINION

BUSSEY, Judge:

Appellant, Alan Leroy Fulbright, hereinafter referred to as defendant, was charged, tried and convicted in the District Court of Oklahoma County, Case No. CRF–71–1810, for the offense of Murder. His punishment was fixed at death, and from said judgment and sentence, a timely appeal has been perfected to this Court.

At the trial, Abigail Burks, nineteen (19) years of age, testified that she first met the defendant in May 1971 and started living with him in June. On August 5, 1971, she, Susie Trout, and the defendant went to Arkansas where Susie was going to show the defendant some connections where they might purchase liquid amphetamine. Susie pointed out several places but they were unable to complete the purchase. They returned to Oklahoma City. She admitted using narcotics and drinking wine during the trip to Arkansas. They returned home and Susie spent the night. The defendant woke her up about 5:30 the following morning and they got into an argument about having sex. The defendant told her to get her things together and he would take her home. The defendant asked Susie if she wanted a ride home and said he would take her home also. The defendant drove out to the dump yard and the defendant got out, stating that he was going to just look around. The defendant returned to the car and told her to wake

Susie up. The defendant got a shotgun from the trunk of the car and he and Susie "exchanged a few words." Defendant said, "It's a nice day for a killing." (Tr. 164) They got out of the car and the defendant told Susie to pick up the shovel. Susie said, "Alan, what's wrong. Can't we talk about it?" The defendant hit her across the side of the face with the butt of the shotgun. Susie picked up the shovel and the defendant told them which way to start walking. They walked through the woods at the defendant's directions and the defendant said that he wanted her (Abigail) to walk in front. They started walking and she heard a shot behind her back. She turned around and observed Susie Trout collapse. The defendant was trying to unjam the gun. She started hollering and the defendant told her to "shut up he might not kill me." (Tr. 167) The defendant unjammed the gun and picked up the shell that ejected. The defendant told her to start digging a hole. She dug for a while and the defendant told her to go keep watch on the road. The defendant commenced digging and, after a while, told her to start collecting some dead leaves. After the defendant finished digging the hole, he put Susie into the hole and covered her up. The defendant jumped up and down on the grave and required Abigail to do the same. He spread the leaves and two logs over the grave. The defendant then got the shotgun and shovel and they returned to the car. As they were driving away, the defendant told her to throw away his gloves because they had blood on them. She threw the gloves out the window and they landed in a tree. Shortly after shooting Susie, the defendant stated that "she was no good and she was a snitch and she was going to set us up and get us busted and that was it." (Tr. 176) The defendant told her to say that Susie could not make up her mind where she wanted to go so they dropped her off at Agnew and Exchange. The following day, Abigail went to her mother's house, told her what had happened, and her mother called the police. She subsequently showed the police the grave site and the gloves.

On cross-examination, she admitted living with other men prior to living with the defendant. She admitted using amphetamines, mescaline and marijuana. She testified that Susie and the defendant appeared to be friendly on the trip to Arkansas and the return. She denied grabbing the shotgun and that in the scuffle it went off. She admitted having the opportunity to tell other people about the incident and instead waited until the following day when she told her mother.

Dr. Charles Marshall, a pathologist, testified that he performed an autopsy on Carolyn Sue Trout on August 8, 1971. In his opinion, the cause of death was a shotgun wound to the right rear of the head. He determined that the shot was fired at very close range in a slightly downward direction.

Detective Richard DeLaughter testified that on August 8 he went to an abandoned oil lease with Abigail Burks and she pointed out the grave and a pair of gloves in some bushes along the road side.

Detective A. J. Clovis testified that on August 8 he recovered State's Exhibit No. 5, a shotgun, from the Tillman residence. In his opinion, the shotgun had been recently fired.

Officer C. E. Phelps testified that he was present when the grave was opened. They found the victim buried approximately one and one-half feet under the ground. He testified that the following day, he recovered some clothing from 2224 S.W. 34th and found three .410–gauge shotgun shells in the pocket of the clothes.

Detective Jim Blair testified that he went to 2224 S.W. 34th at approximately 1:00 a. m. on August 8 to arrest the defendant. He knocked on the door and someone answered, "Who is it?". He responded "police officers" and he heard someone running through the house. He again advised that they were police officers and that he wanted the defendant. When no one answered the door, he went

back to his police unit and used an amplifier to notify the persons inside the house who they were. Larry David Roberts subsequently came out of the house. The officer entered the house and found that someone had gone into the attic. He asked the person in the attic to come down several times and finally a tear gas container was placed through the attic vent. After several minutes, the defendant fell through the attic hole. The defendant was removed from the house and immediately advised of his constitutional rights. The defendant responded that he knew his "fucking rights". They moved further away from the house because of the tear gas and the defendant was again advised of his constitutional rights. Defendant acknowledged that he understood the same. The officer asked him about Susie Trout. The defendant stated that he, Abigail Burks and Susie Trout made a trip to Arkansas and returned early Friday morning. The defendant stated that the only thing he could remember was that they came back around Draper Lake where the girls had shot liquid amphetamine. The defendant stated that "this girl was on a rib and was telling us a bunch of crap, and it was false accusations and everything." (Tr. 280)

For the defense, Minnie Evelyn Holder testified that the defendant and Abigail Burks lived with her at 2224 S.W. 34th Street. She testified that the defendant and Susie Trout appeared to be on amiable terms prior to going to Arkansas. The following evening, Abigail did not seem nervous or upset nor did she mention anything unusual happening.

Larry David Roberts testified that he was with the defendant, Susie and Abigail the night before they went to Arkansas. All three of them took barbiturates. They all appeared to be getting along fine. He observed Abigail the following evening and she seemed to be "in better spirits and mood than she had ever been before." (Tr. 310) He testified that Susie Trout used drugs and consistently furnished drugs to the defendant. He admitted four prior felony convictions.

Sybil Tillman testified that the defendant "has been like our son for about 10 or 11 years." The defendant, Abigail Burks and Susie Trout came by her house on the morning of August 5. Everything seemed to be normal between the three. The defendant and Abigail came back to her house the following afternoon. Abigail did not seem nervous, excited or scared.

The defendant testified that he was twenty-five years old and since age twelve had been in the State Training School, State Reformatory and State Penitentiary. He testified that he had been convicted of five felonies. He testified that during the months of April, May, June and July 1971, he stole "lots of property but mostly I was dealing in guns at the time." Around April of 1971, Abigail started living with him on a continuous basis. On the way back from Arkansas, Abigail got mad at Susie because Susie was lying in his lap. When they returned home in Oklahoma City, Abigail took some carbital and went right to sleep. When she awoke the following morning, she accused him of sleeping with Susie Trout. She woke Susie up and started to argue with her. After a while, he told her that if she really believed that he was carrying on with Susie he would take her home. He decided that prior to taking Susie and Abigail home that he would check on his marijuana which he had planted on a creek bed. He took the shovel to transplant some of the marijuana that was about to be washed away. He drove to the old oil well lease, got out of the car and checked on the marijuana. As he was returning to the car, he noticed a couple of squirrels in the woods. He got the shotgun out of the car to shoot the squirrels and told Abigail to go with him to transplant the marijuana. Abigail replied, "I ain't going nowhere unless that bitch goes." He told Abigail that there was no point in taking Susie because she was in no shape to help them. Abigail got Susie out of the car and they started walking through the woods. As they reached a clearing, Susie "just kind of sat down on her knees." Abigail said, "Give me that

shotgun. I'll get that bitch up." (Tr. 342) Abigail grabbed the shotgun, they struggled and the shotgun went off. He testified that he did not report what happened because of the barbiturates, needles and syringes in his car, that he was in possession of a shotgun, and that he knew the police would not believe him. He testified that the arresting officers beat him and mistreated him. He denied knowing that Susie Trout was an informer for the police.

Jean Casey testified that she was employed as the medical records librarian for Mercy Hospital. She identified a hospital report concerning a physical examination of the defendant on August 8, 1971. The report reflected that the defendant's right and left wrists were swollen, and his right hip and rib cage were painful.

The first proposition asserts that Abigail Burks was the common law wife of the defendant and, therefore, under the provisions of 22 O.S., § 702, could not testify against the defendant. The record reflects that the trial court conducted a pre-trial hearing on defendant's motion to suppress the testimony of Abigail Burks. At the hearing, the defendant testified that he and Abigail lived together as husband and wife, that he introduced Abigail to persons as his wife and that he supported her. Defendant introduced a registration card from the Melrose Motel which reflected that he and Abigail checked into the motel on May 20, 1971 as husband and wife.

Kenneth Curlis testified that he ran the Melrose Courts. He identified the registration card. He testified that the defendant and his wife stayed there about a week and a half.

Defendant submitted the testimony of Evelyn Holder, Marla Davidson and Sybil Tillman taken at the preliminary hearing. The witnesses testified that they considered the defendant and Abigail to be husband and wife.

Abigail Burks testified that she lived with the defendant from June until August. She testified that she did not remember the defendant ever introducing her as his wife. She testified that she did stay at the Melrose Courts with the defendant but that the defendant did all the registering and she did not know how he registered her. She testified that she did not at any time hold herself out as being married to the defendant nor did she intend to hold herself out to be married to him.

We are of the opinion that the trial court properly overruled defendant's motion to suppress the testimony of Abigail Burks in view of her testimony that she did not consider herself married to the defendant nor did she ever intend for such a relationship to exist. We further observe that the defendant testified on cross-examination as follows:

"[By Mr. Miller] Q. If that's true, why, after you shot Susie Trout in the back of the head, why did you tell Abigail that you were going to make her marry you at that point so she couldn't testify against you? That doesn't make much sense, does it, if you were already married? Why did you tell her that?

"A. I didn't tell her I was going to make her marry me.

"Q. What did you tell her?

"A. Me and her agreed to go to a preacher to get married.

"Q. If you agreed to do that, why would you do that if you were already married? That's what you are telling the Court. You said you understand real well that you were married. Why would you do that?

"A. So we would have a marriage certificate.

"Q. Well, you just got through telling us that a common-law marriage is just as legal, and you understood it was just as legal as any other kind of marriage. Why would you have to have a marriage certificate?

"A. That way you've got two shots at it.

"Q. That way you would have two shots instead of one, is that right?

"A. That's right." (Tr. 89–90)

In Chapman v. State, 84 Okl.Cr. 41, 178 P.2d 638, we stated:

" * * * A common law relationship is contractual, just as is a ceremonial marriage. It must be founded upon a mutual agreement, to enter into a matrimonial relation, permanent and exclusive of all others, between parties capable of entering into such a contract; consummated by their cohabitation as man and wife as well as their open assumption of other marital duties. When such a claim is made, it must be supported by proof of these elements, Bothwell v. Way. 44 Okl. 555, 145 P. 350. The mere fact of living together, even if accompanied by cohabitation, does not constitute marriage, but only evidence thereof tending to raise a presumption thereof, Gustin v. Carshall, 156 Okl. 173, 10 P.2d 250. Such a relationship, to be valid, must be supported by the recognition of the marriage relation by the parties themselves, by holding out each other as the husband and wife, respectively, Davis v. Reeder, 102 Okl. 106, 226 P. 880. In the absence of children, the evidence to establish such relationship must be clear and convincing. Moreover, the proof of the reputation of the relationship must be general and not special, or divided, Richard v. Richard, 172 Okl. 397, 45 P.2d 101. * * * "

■ The second proposition contends that the trial court erred in overruling defendant's motion for new trial based upon misconduct of the prosecuting attorney on cross-examination of defense witnesses and improper closing argument. We have carefully examined the cross-examination of each of the defendant's witnesses and are of the opinion that the prosecuting attorney did in some instances improperly cross-examine the witnesses concerning their own personal lives, attempting to assassinate their character. We are of the opinion, however, that the improper cross-examination did not constitute fundamental error in view of defendant's attorney's remarks in his closing argument concerning his witnesses. Defendant's attorney stated:

"[By Mr. Burger] * * * I called them to testify because they were witnesses to facts, and unfortunately I can't select my witnesses. I have got to get them right where they are, and they can be the low-downest human beings in the world, but there is nothing I can do about that because the Defendant himself is low down, and he associates with low down people, and not one person who testified in this case outside of Mrs. Tillman and the police officers rises above that category of low down. I would be most pleased if I had somebody who could tell me about this case who bore a good reputation. * * * " (Tr. 440)

■ We next observe that although the defendant objected to portions of the alleged improper argument of the prosecuting attorney, no request was made that the jury be instructed to disregard the improper statement nor was a motion for mistrial made. In Overstreet v. State, Okl.Cr., 483 P.2d 738, we stated:

" * * * We have previously held that if counsel wishes to preserve the record during closing argument of the State, that when an objectional statement is made by the prosecuting attorney, it should be called to the attention of the court by timely objection, together with a request that the jury be instructed to disregard the improper statement and in the event that the objection is overruled, an exception should be taken to the ruling of the court, preserved and argued in the Motion for New Trial. When this is not done, the matter cannot be presented for the first time in the Motion for New Trial and in the Petition in Error and briefs on appeal. * * * "

■ The third proposition asserts that the trial court erred in overruling defendant's objection to the admissibility of evidence during the trial. Although the defendant asserts that several exhibits were improperly admitted, the thrust of his ar-

gument deals with the admissibility of photographs of the grave and a photograph of the deceased. Defendant argues that the photographs had no probative value and were introduced for the sole purpose of inflaming the jury. We have carefully examined the exhibits and are of the opinion that they do have probative value. We have previously held that when a photograph is shown to be a faithful reproduction of whatever it purports to reproduce, it is admissible into evidence as an appropriate aid to the jury in applying the evidence, whether the photograph relates to persons, things or places. Robison v. State, Okl.Cr., 430 P.2d 814. State's Exhibits 1 and 2 were properly admitted as showing the scene of the grave prior to the excavation. State's Exhibit No. 10, the picture of the deceased, was properly admitted as having definitive probative value in reconciling conflicting testimony concerning the circumstances of the shooting. Abigail Burks testified that the victim was standing at the time she was shot and Dr. Marshall testified that the bullet had a slight downward trajectory wherein the defendant testified that she was sitting on her knees at the time the gun was fired. The photograph shows the location of the gunshot wound and was not taken after extensive autopsy surgery. See Ashton v. State, Okl.Cr., 478 P.2d 932.

 The final proposition contends that the trial court erred in admitting statements made by the defendant immediately following his arrest as due to the circumstances defendant could not make a knowing, intelligent waiver of his rights as is demanded by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. We need only observe that the trial court conducted an evidentiary hearing concerning the motion to suppress defendant's statement. At the conclusion of the hearing, the trial court stated:

" * * * The Court finds from the evidence offered that such statements by way of admission or confession or whatever they are which directly resulted from the interrogation about which Officer Jim Blair has testified appears to be voluntary under the Miranda rule and under the common sense of the word, 'voluntary', and he will be allowed to testify under proper Instructions of the Court of course, placing the question of voluntariness before the jury if that is appropriate. We won't know until we hear what he says; but if any statements made by the Defendant, or alleged to have been made by the Defendant are attempted to be recited by Officer Blair or anyone else, unless they appear to be directly attributable to the conversations indicated, we will consider those when they come up." (Tr. 135)

We concur with the trial court's finding that the defendant was advised of his Miranda rights, and that the question of voluntariness was properly submitted to the jury.

In conclusion, we observe that the defendant's death sentence was modified to life imprisonment on March 14, 1973. The judgment and sentence as so modified, is affirmed.

BLISS, P. J., and BRETT, J., concur.