# Yardley's Estate.

1. On a question of marriage, constancy of dwelling together is the chief element of cohabitation.

2. Cohabitation is not a sojourn, a habit of visiting nor a remaining with for a time.

3. Cohabitation and reputation are not marriage, when conjoined they are evidence from which a presumption of marriage arises.

4. Cohabitation is to have the same habitation so that where one dwells there the other dwells with him.

5. Without concomitant facts to prove marriage an irregular cohabitation and partial reputation is of no avail in the proof of marriage.

6. Vincent's Appeal, 10 P. F. Smith 128, distinguished.

February 3d 1874.   Before AGNEW, C. J., MERCUR and GORDON, JJ.   SHARSWOOD, J. at Nisi Prius.

Appeal from the Orphans' Court of *Philadelphia*: No. 385, to January Term 1872.   In the estate of Howard Yardley, deceased.

The decedent died in May 1868; his estate was devised and bequeathed to collateral relatives, he having left no children.   His executors having settled their account, the balance appearing on it was referred to Edward Hopper, Esq., as auditor for distribu-

25 P. F. SMITH—14

[Yardley's Estate.]

tion.   Elizabeth Sithens, alleging that she was Elizabeth Yardley and had been the wife of the decedent, appeared before the auditor, claiming that she was entitled to a portion of the estate as his, widow.

The evidence taken in the case was not furnished to the reporter, but its character as elucidating the principles decided is probably sufficiently exhibited in the portion of the auditor's report given in the appellant's paper-book and the opinion of the Supreme Court:—

" For more than twenty-five years prior to his death Howard Yardley lived at No. 731 Wood street, in the city of Philadelphia. He was reputed a bachelor amongst his friends and acquaintances to whom he was best known.

" It is alleged and contended, however, by the claimant, who appears before the auditor as 'Mrs. Yardley,' that she is the wife of the testator, and is entitled to a wife's share of his estate. A great many witnesses were examined on both sides.  Their testimony will speak for itself, so that it is unnecessary for the auditor to comment upon it, further than to say that it has left no doubt in his mind as to where the preponderance lies.   He would remark, however, that the testimony of Mary E. Laws, a witness for the claimant, is not entitled, in his opinion, to any credit whatever.

" The most important question before the auditor for his decision is :   Was the claimant the wife of Howard Yardley ?   Her name before she assumed the title of 'Mrs. Yardley,' was 'Elizabeth Siddons ' or ' Sithens.'

" On behalf of the residuary legatee, Edward S. Campbell, Esq., denies and resists the claim of the alleged widow ; contending that the intercourse between Howard Yardley and the claimant was illicit and meretricious.   It is conceded that the testator left no child or children.   The auditor, after carefully considering the evidence and the able argument of counsel, is constrained to reject the pretensions of the claimant, and as matter of fact he finds that Howard Yardley was not her husband.

" The rights and duties incident to marriage spring from the contract.   If there has been no contract, there has been no marriage. While it is true that no particular form of ceremony is necessary, it is, however, essential that the contract itself should have been entered into.'   And therefore the inquiry in all these cases is: Have the parties contracted ?   Such a contract can be proved by the witnesses who were present at the ceremony, and by the admission of the parties.   These are the direct proofs.   Its execution will be presumed from the cohabitation and reputation of the parties.   Cohabitation alone will not do : Com. *v.* Stump, 3 P. F. Smith.   Nor is reputation alone sufficient.   Nor will cohabitation and reputation conjoined establish the marriage unless they be of

[Yardley's Estate.]

such kind as to render the inference irresistible that the contract of marriage has really been entered into. This reputation must be general, and must come from the neighborhood and domicil of the parties.

"In this case there has been no attempt to prove the execution of the contract by witnesses who were present when the ceremony was performed, nor has it been shown that such ceremony ever was performed. I am asked, however, to presume that the contract was entered into, and to justify this presumption, evidence has been produced to show that the parties cohabited together, and that they were reputed to be husband and wife.

"In the opinion of the auditor, the preponderance of the testimony shows that these parties did not live together as husband and wife, and did not bear that reputation, and that they did not sustain that relation continuously among those to whom they were jointly known. They did not live together; and the periodical visits and temporary sojourns of Howard Yardley with the claimant, were not the acts of a husband. His residence, as shown by the testimony of his associates in his own neighborhood, and by his passing acquaintances, was at No. 731 Wood street. He always voted at the precinct in which that house is situated. He died at and was buried from that house. On the other hand, the claimant lived on Wood street, above Sixteenth street, from a time prior to 1850, up to 1860, and at No. 609 Parrish street, from 1860 to the time of Howard Yardley's death; and she remained there after that event, and her receipts for rent paid by her, produced by her (upon call of Mr. Campbell) during the time she occupied these houses, are all given to her in the name of "E. Sithens," and 'Mrs. Sithens.' The first receipt produced being dated May 16th 1855, and the last December 6th 1869, after the present investigation had been carried on for seven months. No attempt was ever made to represent herself to the landlord as *Mrs. Yardley.* No person from the neighborhood in which she lived, such as the grocer, who would have known her and her residence and reputation, was produced. The same may be said as to the neighboring apothecary. Nor was the physician called. These would be the witnesses first called, we should naturally suppose, in a controversy of this kind. The absence of such testimony speaks loudly against the claim set up here, and creates a strong presumption that such witnesses would not testify that she had lived and cohabited with Howard Yardley, and that they were reputed as husband and wife.

"Whatever relation did exist between them, it is very plain did. not arise from the contract of marriage, and that their mode of life, 'their habit and repute,' were not of that character from which a court would be justified in presuming that the contract of marriage had been entered into by these parties. With certain persons, however, she assumed the name of '*Mrs. Yardley,*' and

[Yardley's Estate.]

it is probable that Howard Yardley suffered her to hold him out as her husband for the purpose of gratifying her and keeping up the deception upon them.    It is to be observed that the persons to whom she introduced him as her husband, were her relatives, friends and acquaintances, and visitors to her house, where he was met by them.    That he did not live with her all the time, is most conclusively shown, and if in truth he was her husband, and necessity did not require his absence from the city, as the testimony shows that it did not, why did they not live together?    She practised a deception on a few of her friends and relations, for the purpose of maintaining a respectability in their presence, and to gratify her, he assisted her in it; and the envelope addressed to 'Mrs. Yardley,' if it was so addressed by him, was a part of the deception. It was given to one of her friends, who called at his office for it, and for him to have given any other name to one of the parties upon whom the deception had been practised, would have exposed her at once to disgrace among her acquaintances, and would have put difficulties in the way of his future participation in her society in the manner he had been accustomed to avail himself of it.    That a man may do all these things, and yet 'the evidence fall far short of that which ought to satisfy the mind that there was an actual agreement to form the lawful relation of husband and wife,' is well settled in Bicking's Appeal, 2 Brewster 232.

"The entire conduct of the parties must be such as to lead any one to infer that they were husband and wife.    To those who knew him best, and who knew of her through him, he called her his 'shirt woman,' or 'shirt maker.'    His absence from his home at No. 731 Wood street, if unusual, was called a visit to Germantown. No husband, no actual right-minded husband, would call his wife by such a name, or excuse his visits to her by falsehood.

"It is impossible to presume and believe that these parties were really husband and wife.    The weight of the testimony and the presumption and inference are the other way, and with the auditor, irresistibly so; and it is impossible to say that the claimant has established her assumed position as the widow of Howard Yardley.    Bicking's Case was a stronger one than this, and there the claim of the assumed widow was rejected.    In that case there was a child to be protected in the claim to legitimacy; and the evidence of the conduct of Mr. Bicking towards the child was very strong, yet it fell short of proving the claim of the mother and the legitimacy of the child.    Here the evidence is much weaker; and it is impossible, after carefully examining it with a desire to do justice to all concerned, to say that the claimant was the wife of Howard Yardley."

The auditor accordingly reported that the claimant was not entitled to any portion of the estate of the decedent.

After exceptions the Orphans' Court confirmed the report.

[Yardley's Estate.]

The claimant appealed to the Supreme Court, and assigned the decree of confirmation for error.

*S. W. Pettit* and *G. W. Biddle* (with whom were *F. A. Van Cleve* and *J. R. Read*), for appellant, cited Hill v. Hill, 8 Casey 511; Vincent's Appeal, 10 P. F. Smith 228; Guardians v. Nathans, 2 Brewster 148; Garnis v. New Orleans, 6 Wallace 642; Hamilton v. Hamilton, 9 Cl. & Finnelly 327; Yelverton v. Yelverton, 4 Macq. 790; Campbell v. Campbell, 1 H. of L. Scotch Div. Appeals.

*J. G. Johnson* and *A. Thompson* (with whom was *E. S. Campbell*), for appellee, cited Commonwealth v. Omohundro, 2 Brewster 298; Cunningham v. Cunningham, 2 Dow 514; Hamilton v. Hamilton, 9 Clark & Finnelly 340; Bicking's Appeal, 2 Brewster 232; 2 Greenl. Ev., sect. 464.

The opinion of the court was delivered, February 16th 1874, by AGNEW, C. J.—There is no sufficient evidence of marriage in this case. The alleged cohabitation is partial and unsatisfactory, and the reputation of marriage is divided, the bulk lying on the side of singleness. The address upon the envelope, in the absence of the letter itself, has no weight, especially in the absence of a correspondence such as attends married life, and in the case of a person habituated to writing, as Howard Yardley was. The case depends on the alleged cohabitation and reputation of marriage. But it is a misnomer to call the visits of Howard Yardley to Elizabeth Sithens, cohabitation. It was lacking in its chief element, constancy of dwelling together. His habitation was evidently at the house of his own family which he had never left and where he continued until his death, and was buried from it—the place where he was taxed, and from which he voted. Elizabeth Sithens was unknown to his relatives, except as his shirtwoman; never visited them, and did not follow his remains to the grave. His visits to her were evidently of an irregular kind, and though frequent, and continued for years, they bore no resemblance to married life. Loose notions seem to prevail as to what cohabitation is. It is not a sojourn, nor a habit of visiting, nor even a remaining with for time. None of these fall within the true idea of cohabitation as a fact presumptive of marriage. Neither cohabitation, nor reputation of marriage, nor both, is marriage. When conjoined they are evidence from which a presumption of marriage arises. The legal idea of cohabitation is that which carries with it a natural belief that it results from marriage only. To cohabit, is to live or dwell together.; to have the same habitation; so that where one lives and dwells, there does the other live and dwell always with him. The Scotch expression conveys the true idea, perhaps, better than

[Yardley's Estate.]

our own—"the habit and repute" of marriage.    Thus when we see a man and woman constantly living together—where one is dwelling there the other constantly dwells with him—we obtain the first idea or first step in the presumption of marriage ; and when we add to this that the parties so constantly living together, are reputed to be man and wife, and so taken and received by all who know them both, we take the second thought or second step in the presumption of the fact of a marriage.    Marriage is the cause, these follow as the effect.    When the full thought contained in these words, co-habitation and reputation of marriage, is embraced, we discover that an inconstant habitation and a divided reputation of marriage, carry with them no full belief of an antecedent marriage as the cause. The irregularity in these elements of evidence is at once a reason to think there is irregularity in the life itself, the parties lead ; unless attended by independent facts, which aid in the proof of marriage.    Without concomitant facts to prove marriage, such an irregular cohabitation and partial reputation of marriage, avail nothing in the proof of marriage.    It is precisely in this respect that this case has no resemblance to Vincent's Appeal.    Had that case rested on cohabitation and reputation alone, no marriage could have been inferred—the "double life" and divided reputation of marriage would have decidedly condemned the conclusion.    But De Amarelli's conduct was marked by so many circumstances dis-closing a true marriage, that when linked with the pure unspotted character of Catharine Evans, her wife-like conduct, and the repu-tation of their marriage beginning with facts tending to prove marriage at the very outset, the evidence of marriage was com-plete ; while the reasons accounting for inconstant cohabitation were strong and peculiar.

It is argued here that the meretricious intercourse, to be inferred from the early relations of these parties, ought not to forbid a conclusion that the marriage relation existed afterwards, and we are referred to (among others) the case of Campbell *v.* Campbell, Law Rep. 1 Scotch Divorce and Appeal Cases, before the House of Lords.    But no case better illustrates the true idea of cohabita-tion than it.    Mrs. Ludlow, a young and comely woman, eloped with Captain Campbell.    Ludlow, the husband, died within two or three years afterwards.    Captain Campbell and his reputed wife went to America, and thereafter constantly lived together as man and wife, were so accepted and known in his regiment and on his return to England were so received and recognised among all his relatives and acquaintances, including his relative, the Earl of Breadalbane, whose estate became the subject of controversy. They had children, who were baptized as theirs, and were accepted and received as legitimate offspring.    Among other facts, Captain Campbell gave to her a general power of attorney in which he named her as "his wife, Eliza M. Campbell, residing at Maple-

[Yardley's Estate.]

burgh (his residence), near the city of Edinburgh." Thus they lived constantly together, moving from place to place together, always known and recognised as husband and wife, until his death, and after his death his son was recognised as heir in legal proceedings of tailzie. The evidence of cohabitation and general repute of marriage was most complete, said Lord Chancellor Chelmsford. The proof was so strong and overwhelming, it overcame the original meretricious relation, and afforded convincing evidence of a subsequent marriage by contract, all that is required by the Scottish law of marriage. In the case before us there is no such evidence, the case being left to rest upon a broken and irregular cohabitation, and a reputation whose weight lay on the side of single life. From the whole evidence we can draw no other conclusion, than that Elizabeth Sithens was a kept mistress, and not a wife.

Decree affirmed, with costs to be paid by the appellant, and appeal dismissed.