### RICHARD v. RICHARD.

No. 25262. April 16, 1935.

Rehearing Denied May 28, 1935.

R. S. Cate, Charles P. Gotwals, John T. Gibson, Wm. A. Killey, and James D. Gibson, for plaintiff in error.

D. H. Linebaugh, for defendant in error.

PER CURIAM. The defendant in error, Lometa Richard, hereafter referred to as plaintiff, brought this action in the district court of Muskogee county, Okla., against the plaintiff in error, Eastman Richard, hereafter referred to as defendant, wherein she alleged she was a resident of Muskogee county, Okla., and was married to the defendant on or about the 1st day of October, 1930, and continued to live with him as his wife until on or about the 15th day of May, 1932, when they ceased to live together as man and wife and had not since said date cohabited as man and wife, but lived separately and apart; that since said date defendant had been guilty of gross neglect of duty, as he is of ample means and an able-bodied man in good health, but has refused to support plaintiff or make provision for her wants and necessities, although defendant has an annual income in excess of $20,000 and plaintiff has no property or income for her support.

Defendant filed answer, consisting of a general denial, duly verified, and after trial, upon the merits the trial court found, in substance, that defendant is an enrolled full-blood Creek Indian, and during the month of October, 1930, proposed marriage to plaintiff, which proposal was accepted, and thereby plaintiff and defendant entered into a marriage contract as at common law, and thereupon became husband and wife and have since continued as such, and that defendant has been guilty of gross neglect of duty toward plaintiff, and that plaintiff is without fault and without means to support herself, and that defendant has an income of approximately $1,500 per month, and plaintiff is entitled to the sum of $200 per month for her support and maintenance so long as defendant lives separately and apart from her, and awarded her in addition the sum of $3,000 as attorney's fees in the action; thereafter the motion for new trial of defendant was overruled and appeal taken to this court therefrom.

Defendant assigns as error, among others, the overruling of his motion for new trial —in not rendering judgment in favor of defendant—and that the judgment is not sustained by the evidence and is contrary to law.

We have carefully reviewed the evidence set forth and contained in 388 pages of the case-made and the briefs of parties hereto, and, without attempting to discuss and pass upon each and every contention set forth in the briefs, will set forth briefly the reasons for the conclusion hereinafter set forth in this opinion for the disposition of this appeal.

Plaintiff did not seek a judgment of divorce, but only an allowance for separate maintenance and cost of prosecuting this action, and in accordance with the principles announced by this court in Walker v. Walker, 140 Okla. 1, 282 P. 361, no contention is made concerning the right of plaintiff to maintain this action in the trial court and the award of monthly allowance, or the amount awarded by the trial court, if the finding and decree of the trial court is sustained as to the alleged contract of marriage and the entering the marital status thereby.

It is contended by defendant that, this suit being of equitable cognizance, this court will weigh and consider all of the testimony and evidence and render such judgment or decree as the trial court should have rendered, while the plaintiff contends that the credibility of the witnesses is solely a question for the trial court, the same as in an action at law tried with or without a jury.

The rule applicable to this appeal is stated by this court in Long v. Anderson, 77 Okla. 95, 186 P. 944, as follows:

"Under the rule repeatedly announced by this court, in cases of equitable cognizance where the judgment of the trial court is clearly against the weight of the evidence, it is our duty to render, or cause to be rendered, such judgment as the trial court should have rendered."

See, also, Voris v. Robbins, 52 Okla. 671, 153 P. 120; Heckman v. McQueen, 57 Okla. 303, 157 P. 139; Moorman v. Pettit, 119 Okla. 22, 248 P. 838; State ex rel. Shull, Bank Commissioner, v. Moore, 167 Okla. 28, 27 P. (2d) 1048.

The evidence admitted by the trial court is very conflicting, and in many matters irreconcilable, and we will not review in detail all of this evidence but only set forth, in substance, the facts which we think are controlling on this appeal.

The record shows that the plaintiff at the time the suit was filed in April, 1933, was a resident of Muskogee county, Okla., having been born in that county on September 7, 1907, and thus approximately 25 years of age, a three-eighths blood Cherokee Indian, but not enrolled because born too late for enrollment; that when 17 years of age she

was married at Wagoner, by a justice of the peace, her husband dying about two months thereafter, and that thereafter she married Simpson McCoy, but never lived with him as his wife as he left her the day they were married, in 1927, and went to Texas and secured a divorce from her there, and she has never heard from him since; that defendant was a duly enrolled full-blood Creek Indian between 55 and 60 years of age, and speaks English but can read but very few words, and cannot write in English, but can affix his initials, "E" and "R."

At the trial the court permitted the use of an interpreter for the defendant, and some of his answers were given by himself in English and other answers through the interpreter; defendant testified that he had lived at Richardsville, Okla., in McIntosh county, all of his life, and had never lived any other place, owning a home there consisting of a two-story frame house of 12 rooms, which was built in 1916; that he had theretofore had four wives; by the first wife eight children were born, having been married to her by a minister before statehood, and that his first wife died about 1910; that the name of his second wife was Cinda, but he was not married to her, although he had two children by her, although Cinda secured a decree of divorce from him in the district court of McIntosh county in May, 1927; that Nellie was his wife at the time the residence at Richardsville was built, and that he married her at Okmulgee under a marriage license, and that they lived in that house together about ten years and then they separated, two children being born by Nellie, and he was later divorced from her; that thereafter he married Dollie under a marriage license at Claremore, being married by a judge there, and that they lived together about four years in said house and had one child born to them, which died, and then they parted and he was divorced from Dollie.

Plaintiff, to sustain the burden of proof upon her that she and defendant entered into a common-law marriage contract in October, 1930, and thereafter assumed the matrimonial status of husband and wife, testified in substance that she first met defendant during the month of May, 1930; that she had gone riding with him in his automobile from time to time and he had proposed marriage to her several times, but as she knew defendant's character and reputation concerning his prior marriages that she did not accept any such proposals until he told her he desired to settle down, as he had

been married several times, and this would be the last time, and he would get a license; that when she asked him if he had the license, on an unidentified day in October, 1930, he stated that he had not, but answered, "We will just marry like I always do, Indian fashion," and she said, "That's all right," and she consented to marry him.

No other witnesses were present to testify as to this conversation, but both plaintiff and defendant testify that they spent that night at her mother's home, occupying the front bedroom immediately next to the room occupied by her father and mother, and defendant remained there two days and nights and then returned to his home at Richardsville; that thereafter and until January, 1932, he returned there from two to four times per week and would sleep in the same bed with her, sometimes remaining one night and sometimes two days and nights, but would then return to his home in Richardsville. Plaintiff further stated that before they occupied the room adjoining that of her father and mother on the night above mentioned, she told her mother that they were married, but not who had married them, and her mother did not ask; the mother testified that defendant stated to her that he and plaintiff were married and he wanted to room there with them, and that both plaintiff and defendant told her they were married, but she did not ask who married them, nor whether they had a marriage license or not, stating, "No, I didn't ask her anything about it, if it suited her it suited me all right." Plaintiff further testified that defendant continued coming back and forth from his home to her mother's home and would spend one or two nights with her and then return to Richardsville and never brought a trunk nor grip there, but did buy some clothes to wear, and that she never went to Richardsville to live with him as his wife, although defendant told her he had a home down there, and she noticed in July, 1930, that he had two housekeepers there.

Defendant testified positively that he had never, at any time, asked plaintiff to marry him, but admitted that plaintiff had a practice of introducing him to people as her husband and saying that he was her husband, and that when she did so he did not say anything, whether it was all right or not, stating, "It was just her way of doing, and anyway she knew they were not husband and wife," and he made no objection on any of these occasions to her calling him her husband in their presence, but answered

through the interpreter, "He says he didn't in their presence when she would introduce him, but he says he had told her often not to introduce him as her husband, because you know I am not your husband." When asked why he testified that members of plaintiff's family knew they were not married, notwithstanding he was sleeping at various times with plaintiff at their home, he answered through the interpreter, "He says the reason was that they knew they were not married, because he never had taken her down to Richardsville, he never did take her home, but that he would come up here and sleep with her," and, further, that he never told plaintiff's mother or anyone else that she was his wife.

It is clear from the evidence in this record that from some unidentified day in October, 1930, until January, 1932, defendant made repeated trips from his home at Richardsville as often as two to four times per week, to Muskogee, and would sleep with plaintiff at her mother's home and then return the next morning or the second day thereafter to his home at Richardsville, going back and forth in his automobile; that during all of that time defendant maintained a home at Richardsville with one or more housekeepers to operate it for him, and that at no time did plaintiff ever move to Richardsville with him or assume or direct the control or management of his Richardsville home as his lawful wife, and never occupied or assumed the status of man and wife with him at his home in Richardsville, and that there was no general reputation or report in the Richardsville community that plaintiff and defendant were man and wife or that defendant ever told the members of his household or the members of his family there or his business associates that plaintiff was his wife or that he was then a married man. On the contrary, H. G. House, a member of the bar at Muskogee county and former Indian Agent, and the business agent of defendant for eight years prior to the trial, testified that, while he paid from defendant's funds the bills as O. K.'d by defendant for rent, food, and clothing for plaintiff, and had handled all of defendant's business affairs since 1925, during all of that time defendant had been living at Richardsville and had never lived in Muskogee; that upon one of plaintiff's visits to his office he asked her when and where she married defendant, and she answered, "I never did marry Eastman, and you know it," and that he had been told several times by defendant that there was no Mrs. Eastman Richard, and that plaintiff and defendant were never married; plaintiff on re-direct examination denied making any such statement to Mr. House as testified by him.

The record also shows that from January, 1932, until May or June, 1932, while plaintiff was living in a rented house belonging to Mrs. Jennings, the rent for which was paid by defendant, that defendant continued his trips back and forth from Richardsville and would occupy the same bed with plaintiff at this rented house, until the break or separation between them in May or June, after which defendant ceased his visits there, and that about a month later plaintiff herself moved from that house and no longer occupied it. Plaintiff's explanation as to why she never moved to Richardsville to occupy his home with him there as his wife is that he advised her not to as his housekeepers and the members of his household there would poison her; she stated that they were mean to her when she visited there in July prior to the alleged marriage agreement.

It would unduly prolong this opinion to review in detail the conflicting and contradictory evidence of the witnesses for plaintiff and defendant contained in this voluminous record; plaintiff testifies that defendant agreed to marry her "Indian fashion," on this day in October, which defendant positively denies, and there is no evidence that there were witnesses present to hear the conversation, if it occurred, between the parties. The record clearly shows that defendant slept with plaintiff at her mother's home intermittently, and as often as from two to four times per week, from October, 1930, until January, 1932, and then did likewise from January, 1932, to May or June, 1932, while she lived in the Jennings rented house, but never remained with her at either place more than one or two nights at a time, and would then return to his large home at Richardsville which was kept and maintained by him during all these periods. The record shows no marriage by defendant "Indian fashion" prior thereto, unless he married Cinda in that manner, although he testified he had never married Cinda, but it is admitted that she procured a divorce from him in the district court of McIntosh county; defendant repeatedly stated to his business agent, H. G. House, that he had never made any contract of marriage with her, even though he permitted plaintiff to state to third parties in his presence that she was his wife, and there is evidence, also denied by defendant, that he made a statement to a witness that plaintiff was his wife and

not his daughter, although it is clear that defendant supported plaintiff during this period to the extent of paying for her living expenses, including food and clothing; that during the first five or six months of 1932, defendant paid the rent for the separate house for her, including electric, water, and gas bills, and food and restaurant bills, but there is no convincing evidence that defendant, with an income found by the court to be approximately $1,500 per month, ever contributed to her support to the extent that she was entitled to have contribution if she was his legal and lawful wife during that period; nor that she ever moved to the home he maintained at Richardsville during all of this time, nor cohabited with him there as his wife, nor did defendant ever move his household goods and clothing to Muskogee or abandon his home at Richardsville; nor did he join with her in maintaining and operating a joint home in Muskogee in accordance with his financial ability and income and support and maintain her in the manner in which she would be entitled to live if she were his lawful wife. There is no evidence that the plaintiff, who testifies she was without means of support, at the time of her alleged marriage or at any time thereafter, ever made any trip to Richardsville, demanding that she be permitted to establish herself in his twelve-room house at Richardsville as his lawful wife, and enjoy the comforts and luxuries to which she would be thus entitled as the wife of a man of means and such monthly income, with an automobile and a driver for her use and convenience as such wife, nor that she told his neighbors in the Richardsville community, or the members of his family, or his housekeepers, that she was the lawful and wedded wife of defendant. Mr. House, the confidential agent of defendant, testifies she told him she was not his wife, although she specifically denies making any such statement to Mr. House, and defendant testified that he never took her to Richardsville to live as his wife because plaintiff knew at all times that she did not bear such relationship to him, even though the evidence shows he was keeping her in Muskogee at his expense in a manner of living and upon a scale much below that to which she would be entitled as his lawful wife. It is apparent that if plaintiff thought during that period that she was the lawful and wedded wife of defendant, her attitude and conduct as explained from the witness stand is not in accord with what she was entitled to as such, and that while defendant was paying for her keep in Muskogee, in his mind his cohabitation with her was meretricious and not matrimonial, and that he did not think he had agreed to marry her or had consented to assume the marital status with her by taking her to his then established home in McIntosh county as his lawful wife, although the evidence showed that during said period he was willing to continue a meretricious relationship with her in Muskogee and in return therefor to pay for her clothing, food, and other items of support.

This court has heretofore recognized the validity of a common-law marriage in this state, when properly established by competent evidence thereof, and while the contract of marriage must be proven as other contracts are proved, circumstantial evidence of cohabitation, reputation, declarations, conduct, and admissions is admissible, not to make the contract of marriage but as evidence that such a contract had theretofore been made between the parties.

In Gustin v. Carshall, 156 Okla. 173, 10 P. (2d) 250, this court held:

"Cohabitation and reputation do not constitute marriage, but only evidence tending to raise a presumption of marriage from circumstances. In any case, the cohabitation must not be meretricious, but matrimonial, to raise the presumption. Such presumption does not arise where it is not shown that there was a recognition of the marriage relation by the parties and a holding out of each other as husband and wife, respectively."

In Proctor v. Foster, 107 Okla. 95, 230 P. 753, this court said:

"This court has likewise held that cohabitation and reputation do not constitute marriage, but only evidence tending to raise a presumption of marriage from circumstances, and in order to create said presumption it must be shown that the parties have openly cohabited as husband and wife for a considerable time, holding each other out, and recognizing and treating each other as such by declarations, admissions, or conduct, and are accordingly generally reputed to be such among their relatives and acquaintances and those who come in contact with them."

In Fender v. Segro, 41 Okla. 318, 137 P. 103, this court said:

"An irregular, limited, or partial cohabitation is not sufficient to create a presumption in favor of marriage. It must be continuing and complete and such as is usual between persons lawfully married."

The evidence in this case clearly shows that the cohabitation between plaintiff and

defendant was at all times irregular, limited, and partial, and, therefore, such evidence was not sufficient as to cohabitation to create a presumption of the marriage contract and marital status, or to prove the same by circumstantial evidence.

Concerning reputation, declarations, conduct, and admissions of the parties, there is evidence that defendant permitted plaintiff to state in his presence to members of her family and her acquaintances in Muskogee that plaintiff and defendant were husband and wife, and that there was some reputation in Muskogee that plaintiff was the wife of defendant, and also testimony that defendant admitted to parties in Muskogee that plaintiff was his wife, all of which testimony is unequivocally denied by defendant; there is, however, no evidence of any reputation, general or special, in the vicinity of defendant's home at Richardsville in McIntosh county, that plaintiff and defendant were husband and wife, or that defendant advised any of his relatives, members of his household there, or business associates, that plaintiff was the lawful wife of defendant.

In Davis v. Reeder, 102 Okla. 106, 226 P. 880, this court said:

"The above cases all reflect the opinion that, where a party seeks to prove a marriage by facts and circumstances, it is necessary to prove a continuous cohabitation of the parties as husband and wife—that is, they had held themselves out as man and wife—and, second, that the parties were generally recognized and reputed to be man and wife by their friends and relatives."

There is no evidence in this record that plaintiff and defendant were generally recognized and reputed to be man and wife "by their friends and relatives," but only so recognized and reputed by the friends and relatives of plaintiff in the Muskogee community, as no attempt was made to prove any such recognition and reputation by or among the friends, relatives, business associates, and members of defendant's household at Richardsville, as both counsel for plaintiff and the court considered that such evidence would be immaterial in the trial court.

In McKenna v. McKenna, 180 Ill. 577, 54 N. E. 641, the Supreme Court of Illinois said:

"After carefully considering the evidence in the record, we are impressed with the idea that, instead of these parties cohabiting as husband and wife, and holding themselves out to the world as such, there was a constant effort to conceal what they must have believed was an illicit cohabitation. The reputation, at least, is divided, and is not sufficient proof of marriage. What was said by Lord Elden in Cunningham v. Cunningham, 2 Dow, 482, seems to apply here: 'When the connection was at first notoriously illicit, and a change in the character of the connection must be operated, and the means employed for that purpose are such as to leave half the world in doubt, the relations one half thinking one way, the other half the other, at what time, in what circle. could it be said that there was such a habit and repute as raised the presumption that the parties had mutually consented to be husband and wife? He could not admit that mere cohabitation as man and woman was a cohabitation as husband and wife.' "

In Laurence v. Laurence, 164 Ill. 367, 45 N. E. 1071, it is said:

"It is necessary to a valid marriage that both parties should consent to the marriage agreement, and assume the marriage status. Bish. Mar. & Div. 521-528; Hutchins v. Kimmell, 31 Mich. 126.' It is impossible to fix a standard by which the evidence of a marriage in every case should be measured. Each case must depend upon its own facts and attending circumstances. Those circumstances or shadows which usually attend the lives of those who assume the marriage relation are important in determining the question of whether a marriage does or does not exist. The conduct and bearing of the parties are regarded by their friends and relatives, and by those with whom they associate. Introducing each other as husband and wife, and holding each other out to the world as such, are circumstances of more or less weight, as they have relation to the length of time the parties have lived together, and the like. These are circumstances or shadows which we know by observation almost universally attend the married state, and are always expected to attend it: and their presence or absence is highly important in determining whether a marriage without ceremony has been entered into. To ignore them would open the door to fraud and imposition. invite perjury, threaten the legitimacy of children and the rights of heirs, and endanger the social fabric which rests on the institution of marriage. Marriage will sometimes be presumed from cohabitation, but this presumption may be overcome, as cohabitation may be, and frequently is, meretricious, as well as matrimonial."

Concerning general reputation as to marriage, in Jackson v. Jackson, 82 Md. 17, 33 Atl. 317, it is said:

"If a man and woman are generally reputed to be married, or if the converse is generally asserted, a general reputation, one way or the other, exists: and of a general reputation, and none other, the law allows

evidence to be given. But, if it be not general, then obviously it does not exist as a fact, and evidence cannot be received to show a partial, limited, or qualified repute. When the courts employ the term 'divided reputation' it is not meant that an individual can have such a thing as two opposite general reputations at the same time. A condition of that sort is an impossibility. A reputation cannot be general if it is not general, and no reputation of a marriage but a general reputation is competent evidence to establish marriage. General reputation, whether affirmative or negative, is a fact to be proved like any other fact within the knowledge of witnesses by the witnesses who know it. If it exists at all, it exists as a fact. That which goes to make it up is hearsay, but that which the hearsay does make up is a fact. Now, when parties are generally reputed to be man and wife, the general reputation thus asserted 'is a fact. If the witness called to establish that fact does not know that such a general reputation prevails in the community, he does not know the party's general reputation on that subject, and of course he can give no evidence of it."

In re Wallace's Estate, 49 N. J. Eq. 530, 25 Atl. 260, it is said:

"A few expressions of Chief Justice Agnew, in Yardley's Case, 75 Pa. 207, will serve to illustrate that which is meant by matrimonial cohabitation. He says: 'But it is a misnomer to call the visits of Howard Yardley to Elizabeth Sithens cohabitation. It was lacking in its chief element,—constancy of dwelling together. * * * His visits to her were of an irregular kind, and, though frequent and continued, bore no resemblance to married life.' He further says that matrimonial cohabitation is where the parties 'have the same habitation, so that where one lives and dwells, there does the other live and dwell always with him.'

"There is another element necessary to adequate proof of marriage by cohabitation and repute. The repute must be general, extending to the relatives and friends of both parties, with whom their daily lives are spent. It must not be divided, as though only playing a part in one side of a secretive or double life. Where a man cohabits with a woman of a more humble sphere of life than he customarily moves in, permitting her friends' and acquaintances to believe that they are married, but at the same time both he and she refrain from permitting his friends and relatives, with whom he constantly intermingles and lives, to know of the cohabitation and repute, the reputation is divided, and correspondingly of less evidential value; for, under particular circumstances, a man, to preserve the good name of his mistress with her relatives and

associates, and to subserve his and her convenience, may be willing that she shall assume among those people a different character from the disgraceful one to which she really is entitled. * * * It is clear, from all the testimony, that if Josiah visited Elizabeth during the period covered by the caveator's proofs, his visits must have been occasional, short, and, so far as his friends and associates were concerned, secret. They clearly did not partake of the matrimonial character. Their repute, given character by insincere declarations, was confined to the narrow circle of Elizabeth's acquaintances."

In Maxwell v. Maxwell, 98 N. J. Eq. 493, 131 Atl. 215, 218, it is said:

"In this situation, the defendant, to prevail must show that McClellan and the complainant lived together in such habit and repute that a presumption is raised of a contract of marriage per verba de praesenti.

"In Commonwealth v. Stump, 53 Pa. 132, at page 136, 91 Am. Dec. 198, Chief Justice Woodward said:

"'Reputation and cohabitation at best are only presumptive proofs, and, where either of those grounds fails, the court should not allow the presumption of marriage to be built upon the other.'

"In order to establish a presumption of a common-law marriage by habit and repute, there must not only be shown cohabitation, but reputation as husband and wife. Neither reputation without cohabitation nor cohabitation without reputation raises this presumption.

"In Re Yardley's Estate, 75 Pa. 211, Chief Justice Agnew said:

"'Neither cohabitation nor reputation of marriage, nor both, is marriage. When conjoined they are evidence from which a presumption of marriage arises.'

"He says, further:

"'The Scotch expression conveys the true idea, perhaps, better than our own—"the habit and repute" of marriage. Thus when we see a man and woman constantly living together—where one is dwelling there the other constantly dwells with him—we obtain the first idea or first step in the presumption of marriage, and when we add to this that the parties so constantly living together are reputed to be man and wife, and so taken and received by all who know them both, we take the second thought or second step in the presumption of the fact of a marriage. Marriage is the cause: these follow as the effect.'"

In Eldred v. Eldred, 97 Va. 606, 34 S. E. 477, the court held:

"1. Reputation, to prove a marriage,

must be founded on general, not divided or singular, opinion; and, if reputation is divided, it is no evidence at all.

"2. The value of a party's declarations to prove his marriage depends on the circumstances under which they were made. * * *

"5. Where reputation of a marriage is divided, or the cohabitation partial or irregular, the virtue of the cohabitation is discredited, and the presumption of marriage resulting therefrom fails, unless otherwise strengthened. * * *

"7. Where the cohabitation of the parties is not shown to have been matrimonial, and justified by contemporaneous behavior sufficient to give the reputation of marriage, it is neither sufficient to prove marriage, nor raise a presumption thereof."

In the opinion the Supreme Court of Virginia said:

"To believe that E. B. Eldred and Zellah Keiner were married on the 28th or 29th day of June, 1895, and so conducted themselves for 10 months that neither the members of her family, nor servants nor employes about his home, nor their neighbors, had any impression that they occupied towards each other the relation of husband and wife, is too severe a test of human credulity. Morality cannot be upheld, and society protected as our institutions and laws demand, if our citizens are permitted to cover up their immorality, and shield themselves against the condemnation of an indignant community, by declarations made after offending against morality and violating our laws. Our marital laws are plain and simple, not difficult to understand by the humblest citizen; and, except in cases where the proof is clear that the parties claiming to have entered into matrimonial union have in fact done so,—that their cohabitation has been matrimonial, and not illicit,—no presumption of a marriage arises."

Where the legitimacy of children is not involved in a suit to establish an alleged common-law marriage, but only the recovery of money or property, it is essential that where the alleged contract of marriage is asserted by one party and unequivocally denied by the other, the circumstantial evidence upon which this court will find such marriage contract to have been made must be clear and convincing to authorize the affirmance of a decree establishing such contract.

We do not find in this record such evidence, and it is our conclusion that the trial court erred in entering its judgment and decree for the plaintiff below.

It therefore follows that the judgment of the trial court will be reversed, and this cause remanded for a new trial and further proceedings not inconsistent with this opinion.

The Supreme Court acknowledges the aid of Attorneys Edward H. Chandler, Harry Campbell, and Stanley D. Campbell in the preparation of this opinion. These attorneys constituted an advisory committee selected by the State Bar, appointed by the Judicial Council, and approved by the Supreme Court. After the analysis of law and facts was prepared by Mr. Chandler and approved by Mr. Campbell and Mr. Campbell, the cause was assigned to a Justice of this court for examination and report to the court. Thereafter, upon consideration by a majority of the court, this opinion was adopted.

McNEILL, C. J., and RILEY, BUSBY, PHELPS, and CORN, JJ., concur.