**Ernest Clifford MARSHALL, Appellant,**

**v.**

**The STATE of Oklahoma, Appellee.**

**No. F–74–843.**

Court of Criminal Appeals of Oklahoma.

June 19, 1975.

Rehearing Denied July 11, 1975.

**424**

Frasier & Frasier, by Larry A. Gullekson, Tulsa, for appellant.

Larry Derryberry, Atty. Gen., James L. Swartz, Asst. Atty. Gen., David O'Brien, Legal Intern, for appellee.

## OPINION

PER CURIAM:

Appellant, Ernest Clifford Marshall, hereinafter referred to as defendant, was charged and tried in the District Court, Tulsa County, Case No. CRF–73–2264, for the offense of Murder in the Second Degree. He was convicted of the lesser, included offense of Manslaughter in the First Degree, in violation of 21 O.S.1971, § 711. His punishment was fixed at Fifteen (15) years' imprisonment in the State Penitentiary. From said judgment and sentence, a timely appeal has been perfected to this Court.

The State's first witness was Mark Fields, an officer of the Tulsa Police Department. Officer Fields testified that on the night of November 21, 1973, at 9:53 P.M., he and his partner were assigned to proceed to 244 East 51st Place North, in Tulsa, Oklahoma. Upon arriving at the said residence, Officer Fields found Mattie Pierce, the deceased, lying face down in front of the entry door, just inside the house. The officer testified that it appeared that the deceased had expired prior to his arrival. When the ambulance drivers arrived, the attendants turned the body of the deceased over, and the witness, at that time, noticed a .22 revolver which had been on the floor under the body of the deceased. The daughter of the deceased, Latitia Pierce, gave the officers the name of the defendant, Ernest Marshall, as the person who had shot the deceased. The officer further testified that, on examining the screen door to the house, he could definitely tell that two holes, of several in the screen door, were bullet holes made by a caliber much larger than the .22 caliber pistol found under the deceased.

The State's next witness was Latitia Pierce, daughter of the deceased, Mattie Pierce. The witness testified that she was sixteen (16) years old on the date of the homicide and was, at that time, living in the residence of her mother, the deceased. The witness had known the defendant for approximately two and one-half years (2½), and with the exception of the five weeks immediately before the homicide on November 21, 1973, the witness and the defendant had been seeing each other. The witness had given birth to a child fathered by the defendant. The witness further testified that there had been trouble between her mother and the defendant. The deceased and the witness both worked at the Park Manor Nursing Home, and on the morning of the 21st of November, 1973, the witness and the deceased went to a washateria to launder the clothes of the witness. The witness first saw the defendant at the washateria at about 8:30 A.M. He was beckoning for her to come out into the parking lot where he was, but she did not go to talk to him. After the witness and her mother left the washateria, they went to Warehouse Market to do some shopping. The defendant was also in the store beckoning for the witness to come to him and again she did not. When the witness and her mother left the store, the defendant followed them until the witness

pulled in the driveway at her home, at which point the defendant drove on by.

The witness testified that on that same day she and her mother went to work from 11:00 A.M. to 7:00 P.M. and that while she was at work, the defendant called her and told her that he wanted to talk to her, at which time she refused to talk to him.

After work, when the witness had returned home, the defendant again called her and insisted on seeing her. She refused to see him but he said that he was coming anyway.

Leonard Jones, a friend of the defendant and the witness, was at the home of the witness when Ernest Marshall, the defendant, arrived. The witness looked out the window and seeing the defendant, she aroused the deceased, who had been in bed asleep. The witness told the deceased of the presence of the defendant, at which time the deceased asked the witness to go get the gun which had been purchased in the name of the deceased with the money of the witness. The witness got the gun while the deceased put on a robe over her nightgown. When the witness gave the gun to the deceased, the deceased placed the loaded gun in her left robe pocket and went to the door. The deceased opened the front door but left the screen door latched. The defendant asked if Leonard Jones was there and the deceased said that he was not there. The defendant said that he knew he was there because Leonard's car was out there. At that time the defendant and the deceased began to argue and curse and the deceased ordered the defendant to leave her property. The defendant refused, threatening to kill her if she didn't open the door. The witness stated that at that time she heard other persons from out front of the house yelling at the defendant to come to the car. Then, the witness testified, the defendant pulled a gun, at which time the deceased told the witness to call the police. The defendant fired the first shot and the deceased asked him if he was crazy, to which he replied, no, but he "could make her think he was

crazy." The witness went on to say that the .22 caliber revolver was still in the pocket of the deceased at the time the defendant pulled his gun. When the witness was on the phone, the witness testified that the defendant fired more shots. The witness could see the deceased from where she was standing and she testified that she never saw the deceased fire a shot. The first time the witness saw the gun of the deceased, out of the robe pocket, was while the deceased was falling. She further testified that the defendant had shot four or five times. She didn't complete her call to the police because she dropped the phone and ran to the deceased to try and keep her from falling to the floor, which she was unable to do. The witness asked Leonard Jones, who was still present, to help the deceased. Leonard Jones refused to help and left through the front door.

The State's next witness was Officer Richard Campbell, who identified the four slugs which he found in the home of the deceased. The witness testified that the four slugs were larger than a .22 caliber bullet, and were similar to the .38 caliber pistol that officers carry. The officer examined the .22 caliber revolver at the scene and found that it had five live rounds of ammunition and one spent cartridge under the hammer. Upon searching the scene of the homicide, the officers found no trace of the spent .22 slug fired from the gun of the deceased. No final determination was made as to whether or not the deceased had actually fired the gun. However, the witness could testify that there was a hole in the screen which could have been made by a .22 caliber slug and, moreover, the hole was made from something travelling from the inside of the house outward.

Officer Campbell also testified that the weapon which the defendant had used was never recovered.

With consent from the defendant, the State next entered into evidence the autopsy report filed by the medical examiner, showing that the deceased had been shot four times, and that the cause of death was

a result of those gunshot wounds. Thereafter, the State rested.

The defendant called as his first witness Latitia Pierce, who previously testified for the State. The defendant called this witness for the purpose of establishing the relationship that existed between herself, the witness, and the defendant. The witness testified that sometime after the baby was born (her baby by the defendant) the defendant told her that he was going to leave Tulsa for Enid to find a job. In addition, he told her that when he got a job he would come back to Tulsa to get her and the baby. He had been gone for nearly five weeks before he returned on November 21, 1973. On cross-examination by the prosecution, the witness testified that the defendant had in no way supported her or the baby and that her mother had paid for all bills relating to the birth of the child.

The defendant next called Felton Daniels to testify in his behalf. Daniels testified that on the night of November 21, 1973, the defendant, himself, Billy Jean, a girl who came from Enid with the defendant, and Michael Dennis, who was driving the car, all went to the house of the deceased. The defendant told them that he was going there to pick up shoes that he had loaned Leonard Jones. The witness also testified that the defendant had said something about seeing his "kid," or picking up some money. When the defendant got out of the car he told the occupants of the car he would be back in a minute. In the meantime, the occupants of the car began to carry on a conversation. They were interrupted when they heard a shot, and upon turning around and looking toward the house, they saw the defendant pulling a gun from his right rear pocket and begin firing as he ducked and ran from the porch. Daniels testified that the defendant got into the car and said that Latitia's mother had tried to kill him, and that he had fired his gun but he didn't think he hurt anyone. After the foursome had driven around for about twenty minutes, the defendant asked to be let out of

the car. The driver let him out on North Cincinnati and the witness testified that he did not hear of the death of Mrs. Pierce until the next morning.

The defense also called Michael Dennis, who drove the defendant to the Pierce home the night of the homicide and Billy Jean Brown, who had accompanied the defendant on his trip from Enid to Tulsa. Both witnesses were present at the time of the shooting. Their testimonies largely substantiated the testimony of Felton Daniels, with a few exceptions.

Both parties testified, as did Daniels, that the defendant did not fire until after he had been fired upon. They all agreed that he did not pull the gun out until after they had heard the first shot. Daniels and Dennis testified that they did not know the defendant had a gun until they saw him draw it. Billy Jean testified that she knew the defendant had the gun on the way from Enid, but she didn't know the gun was on the person of the defendant at the time of the shooting. The gun did not belong to the defendant. The owner had left the gun in the defendant's car and upon their arrival in Tulsa the defendant left the gun at a friend's house. Billy Jean testified that she did not known when the defendant had picked the gun up again. All of these witnesses testified that the defendant said he didn't know if he had hit anyone. They further testified that the defendant requested that he be let out of the car so as not to get the others involved.

· Leonard Jones, who was in the Pierce home at the time of the homicide, also testified on behalf of the defendant. Jones, for the most part, testified that the account of the shooting by Latitia Pierce, the daughter of the deceased, was incorrect. Jones stated that Latitia was on the phone at the time the shots were fired and that Latitia could not see the doorway from the phone. Jones also testified that he could not see who fired the first shot. He further stated that he did not know why the defendant would come to the Pierce home

to return shoes, since he did not live at the Pierce home. He testified that if someone had wanted to see him that night, they would have gone to his home on South Denver Street.

James Martin was also called by the defense to testify concerning a conversation he allegedly overheard while imprisoned in the Tulsa County Jail with the defendant. He testified that he heard Latitia Pierce, while visiting defendant at the jail, tell defendant that her family had threatened to take her baby away from her if she did not testify against the defendant.

Next, the defendant, Ernest Clifford Marshall, testified on his own behalf as to his relationship with Latitia Pierce and the sequence of events which had led to the fatal shooting. He first established that he and Latitia had discussed getting married and that he was going to Enid to find a job so that he could bring Latitia and the baby back to Enid with him. He testified that he had come to Tulsa from Enid for just that purpose, namely, to take Latitia and the baby back to Enid.

The defendant, in direct contradiction to Latitia Pierce's testimony, testified that on the morning of November 21, 1973, he talked to Latitia over the phone and told her that he was going to take her back to Enid. Latitia told him that she had to go to work and that he would have to call her when she got home about 7:30 P.M. The defendant testified that he didn't call her until about 9:15 P.M. because of other things that he had to take care of. The defendant further alleges, in direct contradiction to the testimony of Latitia, that during the conversation Latitia inquired as to why the defendant didn't come by and see his son. He further stated that Latitia reminded him that he was supposed to return Leonard's shoes, which again contradicted Latitia's testimony.

After talking to Latitia, the defendant alleges that he and his three friends, witnesses for the defendant, went to Latitia's home. He stated that they waited in the car while he went to the door. The defendant testified that when he went to the door and knocked, Latitia asked who it was. After he answered, he waited about thirty seconds while he thought Latitia was getting the baby, but instead the deceased came to the door and asked him if he was crazy for bringing another "bitch" to her house. The defendant replied that he had only come to return the shoes to Leonard. The deceased told him that Leonard wasn't there and the defendant replied that he knew Leonard was there. After further discussion, the defendant testified that Latitia spoke to the deceased and said, "Mama, there's no use in doing that," at which time the defendant looked down and saw the gun in the deceased's hand. The defendant urges that he thought he would try to take the gun away from the deceased, but when he tried to open the screen door he found that it was locked. Unable to get in, the defendant stated that he began to run, at which time the deceased fired at him. He further related that upon being fired at, he pulled the gun from his rear pocket and fired back into the house as he ran. Upon being questioned as to why he shot, he replied that it was only to scare the deceased and to keep her from killing him. He contends that he did not know that he had struck anyone until about 12:00 midnight when he arrived at his mother's home, where he was told by his mother that Mattie Pierce was dead.

The defendant testified that immediately after the shooting he got into the car and was driven around until he requested to be let out. The reason he gave for wanting to be let out was so that his friends in the car would not have to be involved.

In reply to why the defendant had the gun with him at the time of the shooting, he testified that he was going to leave for Enid from Latitia's house. To keep from having to go back to the house where he had left the gun, he brought it with him.

On cross-examination, the defendant further denied ever being at the laundromat or at the Warehouse Market on November

21, 1973. Thereafter, the defense rested its case.

However, in rebuttal, the State called Linda Hickman, a sister to Latitia Pierce. Mrs. Hickman testified that she knew of no occasion on which Latitia had been forced to testify against Ernest, or suffer the consequence of losing her child.

The State also called in rebuttal a previous witness, Latitia Pierce. Leonard Jones had testified that Latitia Pierce could not see the shooting from her position at the telephone. On rebuttal, Latitia testified, by demonstration of a diagram of her home, that she could see the entry door of the home from the telephone. At this time, Latitia Pierce also testified that no one had threatened to take her child away from her if she did not testify against the defendant.

The defendant brings this appeal on two assignments of error, contending that he suffered reversible and prejudicial error. The first assignment of error is that the trial court erred in allowing the testimony of Latitia Pierce, over the defendant's objection, based on an alleged common-law marriage between the defendant and the witness, Latitia Pierce.

In relation to the first assignment of error, the trial court held an in camera hearing to determine the competency of Latitia Pierce as a witness for the State.

In that hearing, the evidence presented disclosed that about four months after the birth of the witness' child, which was fathered by the defendant, the witness spent two weeks with the defendant in the Fairview Apartments where the defendant and his roommate shared a room. Later, when the child was about ten (10) months old, the defendant and the witness had a telephone conversation at which time the defendant contends that the alleged common-law marriage was agreed upon by both parties. In this conversation, the defendant told the witness that he cared a lot for her and that he considered her his wife and he asked her if she felt the same, to which she af-

firmatively replied. The witness testified that three (3) weeks after the phone call, she spent one night with the defendant at which time they had sexual intercourse. She further testified that from time to time thereafter, they would spend a night together, having sexual intercourse on each occasion. The witness further testified that there was no occasion following the telephone conversation on which she or the defendant assumed any marital duties or obligations. The witness' mother, the deceased Mattie Pierce, paid for all the hospital and doctor bills resulting from the birth of the baby. Also, there were several occasions during the witness' testimony in which she expressed a doubt as to the consummation of their marriage. At one point in testimony, the witness stated, "I don't know how he could be divorced from me when I wasn't married to him." And, on another occasion, in answer to an interrogative by the State, asking if the defendant was the only person she pretended was her husband, she answered, ". . . pretended, right." On another occasion, testifying as to the telephone call, over which the common-law marriage was allegedly agreed upon, the witness testified that she told the defendant she would have to think about it.

Also, at this evidentiary hearing, the defendant called Felton Daniels, who testified that they referred to each other as husband and wife, but he said they were actually jesting and as far as he knew they were only going together.

Michael Dennis was also called for the defendant and he testified, as did Daniels, that as far as he knew they were just going together.

The defendant urges that the aforementioned hearing conclusively proves the existence of a valid, common-law marriage. In behalf of his contention, the defendant cites *Porter* v. *United States, 7* Ind.T. 616, 104 S.W. 855, where it was held that if there be any reasonable doubt as to the validity of the common-law marriage, the doubt should be cast in favor of the de-

fendant, thus refuting the testimony of opposed witness. The defendant also cites *Vann* v. *Vann,* 186 Okl. 42, 96 P.2d 76 (1939); *Aurand* v. *Aurand,* 195 Okl. 643, 161 P.2d 857 (1945); and *Tiuna* v. *Willmott,* 162 Okl. 42, 19 P.2d 145 (1933), in support of his contentions that all that is necessary for a common-law marriage to exist is the mutual agreement of parties capable of entering into a marital relationship, consummated by cohabitation as man and wife, or by mutual, open assumption of marital duties and obligations.

However, this Court, in *Chapman* v. *State,* 84 Okl.Cr. 41, 178 P.2d 638 (1947), held that:

"... A common law relationship is contractual, just as is a ceremonial marriage. It must be founded upon a mutual agreement, to enter into a matrimonial relationship, permanent and exclusive of all others, between parties capable of entering into such a contract; consummated by their cohabitation as man and wife *as well as* their open assumption of other marital duties ... ." (Emphasis added)

In the instant case, the alleged common-law marriage fails to meet the test as established by this Court. Taken in its entire context, the telephone conversation during which the agreement supposedly was made was vague and indefinite. The witness, by her own testimony, asserts her uncertainty as to her desire to be married to the defendant. In *Wallace* v. *State,* Okl.Cr., 492 P.2d 332 (1971), the Court failed to find a common-law marriage where the defendant was not sufficiently positive as to the validity of the marriage. Again, in the instant case, witness doubted the validity of the marriage because she suspected that the defendant had a previous common-law marriage which had not been terminated.

Further, we find that the parties did not cohabitate as man and wife. In *Richard* v. *Richard,* 172 Okl. 397, 45 P.2d 101 (1935), the Supreme Court of Oklahoma held that cohabitation must not be irregular, limited or partial, and in the instant case there can be no pretense that the requisite cohabitation existed as between the parties. The witness testified that she never stayed more than one night with the defendant at one time, after which she would return to her mother's home.

Still yet, this Court, in *Chapman,* supra, requires that the parties openly assume marital duties and obligations. Again, there is evidence that the defendant did not, under the pretense of the common-law marriage, support the witness, nor is there evidence of any kind that the witness performed any duties or obligations as a wife to the defendant.

In response to the first assignment of error, this Court finds no common-law marriage. The evidence is wholly inadequate to support such a finding. Taken in its entirety, there was never any positive mutual agreement, permanent and exclusive of all others; there was no cohabitation sufficient to warrant a fulfillment of the necessary relationship of man and wife; and there was, without doubt, no assumption of marital duties and obligations. In final determination, the evidence affords no rational basis justifying a finding for the defendant. The first proposition is without merit.

The defendant offers as his second assignment of error a broad proposition directed toward the remarks and actions of the prosecution, which the defendant contends were injurious and prejudicial, denying him a fair and impartial trial. This proposition concerns some twenty (20) separate incidents, of which many shall be compounded and discussed categorically where the subject matter permits.

As to those remarks made in the opening statements, this Court has held in *Ragland* v. *State,* Okl.Cr., 404 P.2d 84 (1965), that error will not normally be predicated on the prosecutor's failure to introduce evidence which supports comments made in the opening statement, unless such unsupported statements were made in bad faith and were manifestly prejudicial. In

the instant case, those comments to which the defendant objects were, for the most part, introduced into evidence. However, there is one statement by the prosecution expressly suggesting that the deceased was begging for mercy from the defendant just moments before the fatal shooting. This statement, subsequently proven to be false, would not have been error had it been confined to the opening statement, but after the testimony of the deceased's daughter conclusively proving that the deceased was not begging but was, in no uncertain terms, ordering the defendant off of the premises, the prosecutor should have abandoned the argument. However, in the closing argument the prosecutor, ignoring the testimony, specifically referred to the begging and pleading of the deceased, placing particular emphasis thereon.

Before discussing the other comments in the closing argument, it would be appropriate to dispose of the alleged errors based on specific questions and statements made by the prosecutor during examination of the witnesses. We find that none of these allegations merit individual attention, and further that none of them will serve as a basis for error on which modification or reversal may lie.

In reference to the closing arugment, apart from the persistent reference to the deceased's supposed begging, there were other references to issues not justified of record, which appealed to the passion and prejudice of the jury.

One such argument afforded by the prosecutor was based upon society's burden of providing welfare for the defendant and his children. The prosecutor, when addressing the jury, said, "This is the type of person who causes welfare to be necessary. This is the type of person who you will feed and clothe his children because he refuses to accept the role as a citizen in our community and accept the responsibility." In light of the record, there was not basis for such an appeal to the passion and prejudice of the jury. The comment was not relevant to any of the issues, and the evidence offers no substantial basis for the presentation of such a comment.

The prosecutor continually referred to the defendant as trying to break down the screendoor of the deceased's home in an effort to enter the home just before the shooting. The evidence does not substantiate such conclusion. Any presumption that the defendant was trying to break down the door was clearly outside the record.

In another instance, the prosecutor, again appealing to the passion and prejudice of the jury, said, "When Ernie Marshall comes to your house and calls you or your wife a bitch and then threatens to kill you, you'd better do what he wants and not try to protect yourself  .  .  ." We can see no logical purpose for such statements as anything other than those kind of statements which would typify an appeal to the passion and prejudice of the jury. In *Bates* v. *State,* Okl.Cr., 483 P.2d 1384 (1971), and in *Boyd* v. *State,* Okl.Cr., 478 P.2d 980 (1970), this Court held:

> "Although the right of argument contemplates a liberal freedom of speech and range of discussion, it is improper for counsel in closing argument to mislead the jury or inject matters not supported by the evidence; and such improper argument will support modification of the sentence where evidence of guilt is clear and convincing."

In *Mitchell* v. *State,* Okl.Cr., 408 P.2d 566 (1965), this Court held:

> "However, a prosecuting attorney is a public officer acting in a quasi-judicial capacity. It is his duty to use all fair, honorable, reasonable, and lawful means to secure the conviction of the guilty who are or may be indicted in the courts of his judicial circuit. He should see that they have a fair and impartial trial and avoid conviction contrary to law. Nothing should tempt him to appeal to prejudice, to pervert the testimony, or make statements to the jury which, whether true or not, have not been proved."

Taken in its entire context, we feel that those portions of the closing argument insinuated that the deceased was begging for mercy, which is clearly contra to the evidence; that the defendant was the type of man that made welfare necessary, also unsupported by facts; that the defendant tried to break down the door, a perversion of the testimony; that the jury had better do as Ernie Marshall requested if he came to their house and called them or their wives a "bitch" are clearly perversions of the evidence by the prosecutor, in an attempt to appeal to the passions and prejudices of the jury.

In the instant case, the evidence presented by the State was in sharp conflict with that presented by the defendant and, in view of the remarks of the prosecuting attorney, we are of the opinion that they were so prejudicial as to require reversal.

For the above and foregoing reasons, this case is reversed and remanded for new trial.