Susie Blackhawk, also known as Pah-she-he, a full-blood Osage Indian allottee, died intestate in Osage county on March 12, 1939. Probate proceedings were instituted in the county court of Osage county. After hearing and approval of the final account of the administrators, the matter came on for determination of heirs on the petition for distribution. Edward A. Blackhawk, administrator of the estate of John Blackhawk, deceased, petitioned the court to distribute the entire estate of Susie Blackhawk to him as such administrator upon the allegation that John Blackhawk, his decedent, was the surviving husband and sole heir of Susie Blackhawk. However, he alleged that Joseph Cannon and others were claiming some interest in said estate. Joseph Cannon, Mae Lassley, Augustine Black, and certain other Osage Indian relatives of Susie Blackhawk filed petitions claiming to be heirs of said Susie Blackhawk and entitled to distribution of their respective shares in said estate.
Upon hearing, the county court held that John Blackhawk was at the time of the death of Susie her surviving husband and sole and only heir; that she left no issue and no children of any deceased issue, no father, no mother nor brother or sister, and that the whole of her estate descended to the surviving husband, John Blackhawk, a member of the Winnebago Indian Tribe. Two appeals to the district court on questions of law and fact were perfected. The district court held that John Blackhawk was not an heir to the estate of Susie Blackhawk (Pah-she-he), and that the estate of John Blackhawk was not entitled to participate in the distribution of the estate of Susie; the claim of the administrator and heirs of John Blackhawk was dismissed "for the reason that John Blackhawk was not married to Susie Blackhawk." The district court did not determine who were the heirs of Susie Blackhawk. Edward A. Blackhawk, administrator, gave notice of intention to appeal from said finding and order. Pending preparation and service of the case-made for appeal, Reuben Blackhawk, who claimed to be a son and heir of John Blackhawk, commenced original proceedings in this court for a writ of mandamus to compel the district court to proceed further in said matter and determine the heirs of said Susie Blackhawk. The application was sustained and this court held that the order was an interlocutory order and not appealable, and in effect directed the district court to proceed further in the matter and determine the heirs of said Susie Blackhawk. State ex rel. Blackhawk v. District Court of Osage County et al.,190 Okla. 659, 126 P.2d 255.
Thereafter, Edward A. Blackhawk, administrator, moved the district court to direct a mistrial for the reason that the taking of testimony was not concluded prior to the expiration of the July, 1941, term of the district court, and that no order was made continuing the trial until the next term, and that the court lost jurisdiction of the trial of said cause and could not resume trial without commencing the trial anew.
Edward A. Blackhawk's application for certification of disqualification of the district judge was denied. The claimants, other than the Blackhawks, referred to in the record as the Osage Claimants, presented a stipulation for the division of the estate among them and presented evidence in support of their verified claims of heirship. The Blackhawk Claimants presented additional testimony as to their claims, and the Osage Claimants presented evidence in opposition.
The district judge in announcing decision said: *Page 392 
". . . This testimony is simply in addition to, and a continuation of, the original trial of this case. I have looked to the interests of each one of these witnesses that testified in this case, to those who were in position to know as near as could be about the facts and if this court was bound by the proposition or bound by the number of witnesses as to the reputation of somebody or the repute of somebody who knew very little about the whole thing, I would have to change my opinion; but I am of the same opinion that I have been all the time. . . ."
The court directed the distribution of Susie Blackhawk's estate to the heirs as follows:
"(a) To the claimant, Joseph Cannon, an undivided one-fourth interest.
"(b) To the claimant, E ne op pe, and/or to her estate or to her beneficiaries and successors in interest an undivided one-fourth.
"(c) To the claimant, Mae Lassley, an undivided one-tenth.
"(d) To the claimant Alex Cannon, otherwise known as Ed Miller, an undivided one-tenth.
"(e) To the claimant, Charles Brave, deceased, and/or to his heirs, beneficiaries and successors in interest an undivided one-tenth.
"(f) To the claimant, Frank Pyahhunkah, deceased, and/or to his heirs, beneficiaries and successors in interest an undivided one-tenth.
"(g) To the claimant, Augustine Black, an undivided one-tenth interest."
From the decree of distribution Edward A. Blackhawk, administrator of the estate of John Blackhawk, deceased, appeals.
The estate of Susie Blackhawk is a valuable one, and the question of who is entitled to inherit is somewhat complicated. More than 60 witnesses testified, and there are many documentary exhibits. The record contains more than 2,000 pages of oral and documentary evidence. The principal question involved is whether the findings and judgment of the trial court are clearly against the weight of the evidence. Admitted facts are that Susie Blackhawk died intestate, leaving surviving her no children, no children of any deceased child, no father, no mother, no brother or sister; that on or about January 9, 1928, John Blackhawk and Susie Albert, who is the same person as Susie Blackhawk (Pah-she-he), entered into a regular ceremonial marriage contract under a marriage license issued under an application regular in form, signed and verified by John Blackhawk. The marriage license was issued by the county clerk of Rogers county, and the marriage took place in that county; John Blackhawk was a member of the Winnebago Indian Tribe; John Blackhawk died subsequent to the death of Susie Blackhawk.
If the marriage contract between John and Susie Blackhawk was valid, John Blackhawk was the surviving husband and sole heir of Susie Blackhawk, deceased. Defendants in error, the Osage Claimants, contend that the marriage between John and Susie was invalid for the reason that John Blackhawk at the time had a living wife.
John Blackhawk came to Osage county, Okla., about 1920; he had theretofore been married; one child, Edward A. Blackhawk, was born of that marriage; the former wife of John Blackhawk had divorced him; but there is some contention that the decree of divorce is not valid.
Bessie Bright, Peoria Indian, whose maiden name was Bessie Charley, came to Osage county about 1920. At that time Susie (Pah-she-he) was the wife of Paul Albert. Paul and Susie Albert maintained a home and employed servants. In the latter part of 1922 Bessie Bright was employed by Paul and Susie Albert as a cook and housekeeper. Bessie *Page 393 
Bright had been married and divorced from Columbus Bright. She had four children by that marriage. When Bessie Bright went to work for Paul and Susie Albert, John Blackhawk was employed by them as chauffeur. Soon thereafter John Blackhawk and Bessie Bright entered into relations which continued until about the middle of 1925. As a result of that relation two children were born to Bessie; one of the children, Viola Rose Blackhawk, was born about September 17, 1923; the other child, Barbara Marie Blackhawk, was born December 28, 1925. It clearly appears that John Blackhawk was the father of these children. He admitted that he was their father and undertook to enroll them in the Osage Indian Agency as his children under the name of Viola Rose and Barbara Blackhawk. As late as 1934 he sought to have said children enrolled at the Winnebago Indian Agency at Winnebago, Neb., as his children under the name of Viola Rose and Barbara Blackhawk.
The children were actually enrolled in the Peoria Reservation at the Qua-paw Indian Agency under the names of Viola Rose and Barbara Marie Blackhawk. They were baptised and enrolled in the public schools under the same names.
The ultimate question is whether the relations shown to have existed between John Blackhawk and Susie Bright were marital or meretricious. On this question there is conflict in the evidence.
John Blackhawk and Bessie Bright became acquainted about 1920. Neither owned a home in Osage county or elsewhere. While John Blackhawk and Bessie Bright were working at the Paul Albert place they lived in the house in which Paul and Susie Albert lived, and had separate rooms. Bessie worked at the Albert home until the summer of 1923, when she went to work for Mary Logan, a full-blooded Osage Indian. About the same time John Blackhawk went to work as a chauffeur for Mary Logan and her husband. On September 17, 1923, while Bessie was working for Mary Logan and living in her home, the first child, Viola Rose, was born. About October 20, 1923, John wrote Bessie a letter as follows:
"Dear Bessie:
"I have been thinking thinking since I got your letter. I have tho't of mother's name, my sisters aunts names and others too. I must decide on a name while I am writing this letter. I have repeated repeated these names but one name seems real easy I like to say it. It is not after no particular person or anything. I sometimes feel rather tickled to think that I have a daughter when I imagine that I am talking to her. I think I would like to say Viola. I think you have one by the name of Violet. I got your letter after I mailed you one I see it hasn't reached you yet. So I guess her name is Viola.
"Viola Blackhawk a new person in this world who I hope some day will become a woman to be proud of.
"Her brother is now in Sandiago California at a U.S. Naval training Station where he says he can finish his high school course.
"Here I say goodnight and sweet dreams to you both.
"I am yours respectfully,
"John."
Bessie then gave the child the name of Viola, adding the middle name Rose.
In the latter part of 1924, or early in 1925, Bessie again went to work for Paul and Susie Albert in Pawhuska. About the same time John Blackhawk returned there to work. They worked together until the summer of 1925. In December, 1925, Bessie moved to Ponca City, where on December 28, 1925, the second child of John and Bessie was born. During the greater part of the year 1926 Bessie and John Blackhawk worked at the Paul Albert place on 18th and Claremore streets in Pawhuska. They continued to work there until about December 24, 1926, at which time Paul Albert died. During the period from 1922 to 1928, when Bessie was not working for the Alberts or the *Page 394 
Logans, she lived at several different places in and about Pawhuska.
Seven or eight witnesses testified that during that period from 1922 to 1926, or later, John Blackhawk had told them that Bessie was his wife or that John Blackhawk had introduced them to Bessie as his wife. Several other witnesses testified in substance that it was generally understood about the Indian village among the friends and acquaintances of John and Bessie that they were husband and wife or that they were living together in that relation. There is evidence that six or seven times when Bessie moved from one place or house to another, John Blackhawk employed the truck driver and paid the expense of moving. There is also evidence to the effect that John Blackhawk bought clothes for the children, and sometimes furnished groceries for the mother and children.
On January 9, 1928, John Blackhawk and Susie Albert (Pah-she-he) entered into a ceremonial marriage and lived together as husband and wife for about eleven years without protest from Bessie or any other person. In making application for the marriage license, John Blackhawk made affidavit that neither he nor Susie Albert was disqualified or incapable under the law of entering into a marriage relation (C.- M. 1990).
Bessie testified (C.-M. 1116) that she and John Blackhawk were never married; that she never referred to him to any person as her husband; that he never did, to her knowledge, refer to her as his wife; she denied in detail that John Blackhawk had ever introduced her to any of the witnesses or any other person as his wife; that she never told any person that John Blackhawk was her husband or that they were living together as husband and wife. She testified further that she and Henry Bear were married by oral agreement about January, 1928; that she has one child by Henry Bear; that child was about twelve years of age at the time of the trial. She testified that John Blackhawk took care of the two girls until the time of his death and that he sometimes bought them clothes and groceries, but usually sent money. The younger child, Barbara Marie, died after the death of John Blackhawk. Mrs. Violet Bright Smith, the daughter of Bessie Bright Bear, by her first husband, testified that she was born in 1909 and was therefore about fourteen years of age when John Blackhawk and Bessie first worked at the Paul Albert place. She testified that she was in a Catholic convent in 1921, 1922, and most of 1923; that she came to Pawhuska and lived with her mother from about the first of 1924 until after 1926; that the child Viola Rose was about four months old when she first saw her. That she lived with her mother and Rose in 1924 and 1925, when her mother and John Blackhawk worked at the Paul Albert place; that during all that time John Blackhawk never stayed all night in her mother's home; that he never had any clothing or other personal belongings in her mother's home; that her mother never referred to John Blackhawk as her husband, and that she never heard John Blackhawk refer to her mother as his wife, and that she never heard anyone refer to them as husband and wife; that she lived with her mother on 7th street in Pawhuska from about May to December, 1925, and that during that time John Blackhawk was never in her mother's home; that Viola Rose and Barbara Marie were always held out to be children of her mother and John Blackhawk and that they were baptised and enrolled in the public schools under the names of Rose Blackhawk and Barbara Blackhawk.
Fannie Kennerly, a sister of Bessie, testified that she lived with or near Bessie most of the time from 1922 to 1927 and was with her in Ponca City when Barbara was born; that during all that time she never heard Bessie refer to John Blackhawk as her husband; that Bessie told her that John was the father of the two girls; and that she never heard anyone refer to John Blackhawk as being the husband of Bessie. *Page 395 
Some 50 witnesses testified on behalf of the Blackhawk claimants as to their acquaintance and association with John Blackhawk and Bessie from 1922 to 1928. Some of the witnesses worked at the Paul and Susie Albert place when John and Bessie worked there. Others testified that they were friends and acquaintances of John and Bessie and had more or less opportunity to learn of the relation between them. The substance of the testimony of most of these witnesses was that they were acquainted with John and Bessie and that they never heard of John and Bessie being referred to as husband and wife. Some of the witnesses testified that John Blackhawk had told them that he was a single man. Other witnesses testified that Bessie had told them that she was a single woman. Some of the witnesses testified that Bessie had told them that John Blackhawk was the father of the two girls, Rose and Barbara, but that she was not married to John Blackhawk.
The parties agree that the rule in this state is as stated in Vann v. Vann, 186 Okla. 42, 96 P.2d 76:
"In order to constitute a valid 'common-law marriage,' it is necessary that there should be an actual and mutual agreement to enter into the matrimonial relation, permanent and exclusive of all others, between parties capable of making such a contract, consummated by their cohabitation as man and wife, or their mutual assumption openly of marital duties."
In the recent case of In re Trope's Estate, 190 Okla. 453,124 P.2d 733, it is held:
"Where the right of a party to the relief sought is dependent upon the existence of a so-called common-law marriage, the burden is upon such party to establish the facts essential to constitute such marriage.
"In a case of purely equitable cognizance this court will examine the entire record and weigh the evidence, but will not reverse the judgment of the trial court unless it be against the clear weight of the evidence."
Under the rule stated in Vann v. Vann, supra, and Bothwell et al. v. Way et al., 44 Okla. 555, 145 P. 350, and In re Trope's Estate, supra, in order to establish common-law marriage it is incumbent upon the person asserting such marriage to prove an actual and mutual agreement between the parties to enter into the matrimonial relation, permanent and exclusive of all others, and that such agreement must be consummated by cohabitation as man and wife, or their mutual assumption openly of marital duties.
There is no positive or direct evidence in this case of such agreement. But this is not essential. It is well settled that in the absence of direct or positive evidence of express agreement, marriage may be inferred from the conduct of the parties and their standing in the community, declarations of the parties and general reputation. In other words, the agreement may be shown by circumstantial evidence, such as the deportment of married people; that they acknowledge each other as husband and wife; that they were received in society as such, and were generally so reputed. Jackson v. Jackson,80 Md. 176, 30 A. 752.
A marriage may be inferred from proof of cohabitation and general reputation among acquaintances and friends of the parties; their treatment of each other; their speaking concerning and addressing each other in the presence of third parties as husband and wife; the christening of their offspring as their children; the conferring of the name of the father upon their child or children; the children's recognition and treatment by both parties as their children. Here almost all the acts of the parties were consistent with marriage covering a period of years, though there may have been occasional acts and declarations inconsistent with marriage. Adger v. Ackerman, 52 C.C.A. 568, 115 F. 124.
In this case we have evidence of all the elements stated in Adger v. Ackerman, supra, and in addition it is admitted that the children were baptised under the name of the father *Page 396 
and were enrolled in the public schools and the Indian Agency under that name. Therefore there is ample evidence, though the evidence as to reputation is in conflict, from which marriage between John and Bessie could readily be inferred. There is ample evidence to make a prima facie case of marriage based upon circumstantial evidence. But this prima facie case is greatly weakened, if not entirely overcome, by the positive and direct denial of marriage by the mother and the positive proof of subsequent marriage between John Blackhawk and Susie Albert, and positive and uncontradicted evidence of a subsequent marriage between Bessie and Henry Bear, and by other facts and circumstances tending strongly to refute common law marriage between John and Bessie. She was first married to Columbus Bright; when she married him she assumed the surname of Bright. Again in 1928, when she and Henry Bear were married (by common law) she assumed the name of Bear. During all the relations between her and John Blackhawk she never assumed the name of Blackhawk. Her name was carried in the city directory as Bessie Bright. She made contracts for public utilities, such as water, etc., in the name of Bessie Bright.
In Haile v. Hale, 40 Okla. 101, 135 P. 1143, it is held:
"Where a marriage has been consummated in accordance with the forms of the law, the law indulges a strong presumption in favor of its validity."
And:
"One who asserts the invalidity of such a marriage, because one of the parties thereto has been formerly married, and the spouse of such former marriage is still living, has upon him the burden of proving that the first marriage has not been dissolved by divorce or lawful separation."
Where a former marriage is not admitted, the burden of proof thereof would be upon the party asserting it. In Chancey v. Whinnery, 47 Okla. 272, 147 P. 1036, it is held:
"A second marriage being shown as a fact, a strong presumption is raised in favor of its legality, which is not overcome by mere proof of a prior marriage, and that the husband had not obtained a divorce before the second marriage. The party attacking such a second marriage has the burden of proof to show that neither party to the first marriage had obtained a divorce."
And:
"The law is so positive in requiring a party who asserts the illegality of a marriage to take the burden of proving it that such requirement is enforced, even though it involve the proving of a negative."
In the opinion it is stated:
"The authorities, with very general accord, are to the effect that, when a marriage in fact has been shown, the law raises a presumption that it is valid, casting the burden on him who questions it to establish its invalidity. This is one of the strongest presumptions known to the law."
Therein many cases are cited in support of this statement.
The rule seems to be that the presumption of marriage from cohabitation and repute may be rebutted by evidence of separation and subsequent ceremonial marriage of one of the parties to a third person. Jones v. Jones, 45 Md. 144. In that same case on second appeal (48 Md. 391) it is held that where the presumption of a lawful marriage founded simply upon habit and repute is met by the counterproposition of innocence in contracting a second marriage, the former must give way and the law then requires that the first alleged marriage as an actual fact shall be established by more direct proof.
In Waddingham v. Waddingham, 21 Mo. App. 609, it is held:
"The conclusion is inevitable from the adjudicated cases as well as standard text writers that in order to invalidate a second marriage formerly entered into and proven in actual fact, there must be actual, as distinguished from presumptive, proof of the first marriage."
The above case is similar in many respects to the case at bar. *Page 397 
As a general rule, the presumption of the validity of a second marriage will neutralize the presumption of the existence of a former marriage arising out of cohabitation and repute. See Annotations on Presumption Flowing from Marriage, 34 A. L. R. 483.
But this is not necessarily true in all cases. Where the circumstances are substantially conclusive that the parties were married, the additional fact that the parties subsequently separated and one of them married another is not necessarily controlling. Smith v. Fuller (Ia.) 108 N.W. 765. In that case, however, the second marriage of the woman was upon the belief that the first husband was dead.
In Dyer v. Brannock, 66 Mo. 391, it is held that the fact that after entering into a present contract of marriage with a woman, a man cohabited with her for a short time and then joined an expedition of exploration, and then, upon his return after an absence of five years, married another woman, did not negative his good faith and matrimonial intent in entering into the first marriage contract. But in that case there was positive and uncontradicted direct proof of the first marriage contract. Therefore, the subsequent marriage of one of the parties to a third person does not conclusively repudiate the presumption of the first marriage where the facts and circumstances are such as to induce the belief that the marriage relation with the other, if it ever existed, had been dissolved. The fact alone of the subsequent marriage of both parties, under the general rule, would seem to completely refute any presumption of a common law marriage based wholly upon circumstantial evidence. But in addition thereto, we have the positive denial, under oath, by Bessie Bright Bear that there was ever a contract of marriage. It is true that she may have a strong motive for denying the marriage in that she may have the hope that her children, begotten by John, may share in the distribution of the estate of Susie Blackhawk (Pah-she-he) through the father.
The trial judge frankly stated that he did not believe the story of Bessie Bear and gave his reasons therefor. In substance, his reason was that it was unnatural for a mother to bastardize her own children and that she must have been actuated by the motive or desire to have her child participate in the distribution of the estate of Susie Blackhawk (Pah-she-he). But there are other facts and circumstances in evidence, together with the testimony of her daughter and sister, which strongly tend to corroborate her story. In weighing her testimony, careful consideration must be given to her acts and conduct at the time when the motive to deny the marriage did not exist. Her conduct and acts at that time are consistent with her testimony in this case and are consistent with the testimony of her daughter and sister.
Considering the record as a whole, we conclude that the finding of the trial court that there was no valid marriage between John Blackhawk and Susie Blackhawk (Pah-she-he) is clearly against the weight of the evidence. This requires a reversal of the judgment and order, without consideration of the other questions presented.
Reversed, with directions to render judgment finding John Blackhawk to have been the sole surviving heir of Susie Blackhawk (Pah-she-he), deceased, and for further proceedings consistent with the views herein expressed.
CORN, C.J., GIBSON, V.C.J., and OSBORN, WELCH, HURST, DAVISON, and ARNOLD, JJ., concur. BAYLESS, J., dissents. *Page 398