RED EAGLE et al. v. CANNON et al.

No. 33524.   Jan. 8, 1949.

Rehearing Denied May 10, 1949.

Second Rehearing Denied June 21, 1949.

*208 P. 2d 557.*

Worten & Worten, of Pawhuska, and N. E. McNeill, of Tulsa, for plaintiffs in error.

L. R. Stith, of Fairfax, John L. Arrington, of Pawhuska, George F. Short and Welcome D. Pierson, both of Oklahoma City, and Hamilton & Kane, of Pawhuska, for defendants in error, Hum-pah-to-kah, Osage Allottee No. 70, and others.

H. P. White, of Pawhuska, for defendant in error, Joseph Cannon, and the Estate of E-ne-op-pe.

Henry R. Duncan, of Oklahoma City, and Hook & Thomas, Inghram D. Hook, and Harry L. Thomas, all of Kansas City, Mo., for defendant in error Albert J. Fierro.

LUTTRELL, J.   This is an action of equitable cognizance brought by plaintiffs, May Rusk Red Eagle, Bessie Crawford, and Victor Griffin Red Eagle, against L. A. Binkley, administrator, and others as defendants, to vacate a judgment of the county court of Osage county rendered on September 30, 1935, in a proceeding then pending in that court, styled In the Matter of the Estate of Mo-se-che-he, Osage Allottee No. 34.   Plaintiffs are devisees under a will made by Mo-se-che-he, and defendants claim to be heirs of Mo-se-che-he.   The county court, in the proceeding above referred to, held the will of Mo-se-che-he invalid, and that judgment was affirmed by this court in Re Mo-se-che-he's Estate, 188 Okla. 228, 107 P. 2d 999, the basis of the judgment, and the decision affirming it, being that the will had been revoked by the subsequent marriage of Mo-se-che-he to Albert J. Fierro, alias Jack Rogers, on May 19, 1934.

After the decision of this court affirming the judgment of the county court had been handed down, plaintiffs, on March 24, 1943, filed the present action to vacate the judgment on the

512

ground of fraud in the procurement thereof. Defendants demurred to the petition, which demurrers were sustained by the trial court, but that judgment was reversed by this court in Red Eagle v. Cannon, 198 Okla. 330, 177 P. 2d 841. After the reversal issues were joined by the parties and the cause was tried to the district court of Osage county, which made findings of fact and conclusions of law, denied the relief sought by plaintiffs, and rendered judgment in favor of defendants. Plaintiffs appeal.

At the trial of the case plaintiffs contended, and produced evidence tending to prove, that after the decision of this court affirming the judgment of the county court, plaintiffs discovered that Albert J. Fierro, alias Jack Rogers, had entered into a valid marriage in the State of Texas with one Rachel B. Atkins prior to his marriage to Mo-se-che-he, and that the marriage between Fierro and Rachel B. Atkins was valid and subsisting at the time Fierro married Mo-se-che-he, since Fierro had never been divorced from Rachel B. Atkins prior to such marriage. They alleged that Fierro fraudulently concealed this prior marriage from the county court, thus perpetrating a fraud upon the court which justified the vacating of the judgment. Defendants contended, and produced evidence tending to prove, that prior to the last mentioned marriage between Albert J. Fierro and Rachel B. Atkins, which was the third marriage between those parties, Rachel B. Atkins had entered into a valid common law marriage in the State of Texas with one Ford A. Schmitz, and that such common law marriage had never been dissolved at the time of the last marriage between Fierro and Rachel B. Atkins. They contended that therefore, because of such prior common law marriage, Rachel B. Atkins was not competent to enter into a valid marital relationship with Albert J. Fierro on July 10, 1931, the date of said marriage; that therefore Albert J. Fierro was not legally married to her, and was in no wise disqualified to contract a legal marriage with Mo-se-che-he on May 19, 1934.

The trial court, in the instant case, found as a fact that there was a common law marriage between Rachel B. Atkins and Ford A. Schmitz in 1930, which had never been dissolved by annulment or divorce at the time of the purported marriage of Albert J. Fierro and Rachel B. Atkins on July 10, 1931, and that the evidence was not sufficient to establish that the marriage of Jack Rogers, alias Albert J. Fierro, to Mo-se-che-he on May 19, 1934 was void, and the court upheld such marriage as valid.

It thus appears that the decisive question presented for determination is whether the finding of the trial court that there was a valid common law marriage between Rachel B. Atkins and Ford A. Schmitz in the year 1930, which had not been dissolved by annulment or divorce at the time of the marriage of Albert J. Fierro and Rachel B. Atkins on July 10, 1931, is or is not clearly against the weight of the evidence. Plaintiffs assert and here contend that that finding is clearly against the weight of the evidence. Defendants contend to the contrary.

The evidence bearing upon the question of whether or not Ford A. Schmitz and Rachel B. Atkins were common law husband and wife at the time of her third marriage to Albert J. Fierro consists, for the most part, in the testimony of Rachel B. Atkins. She gave her testimony in a deposition taken in June, 1943, at Tampa, Florida, at which time she was married to a man named Canteli. In that deposition she testified that she and Ford A. Schmitz had never been married, and that she did not get a divorce from him for that reason. It is quite possible, however, that in so testifying she was referring to a ceremonial marriage, which admittedly was never performed between her and Schmitz. This for the reason that when asked specifically if she and Schmitz ever had an agreement under the terms

of which she was to take him as her husband and he would take her as his wife, she said, "We just took it for granted". Asked further if she and Schmitz ever talked about it, she said: "I don't remember whether we did or not. It has been so long ago and so much has happened, I don't know". She testified that Schmitz divided his time between Dallas, where his family lived, and San Antonio where she lived, and that upon occasions when his brothers and sisters in Dallas would call her, advising her that Schmitz was drunk and not behaving well, she would go to Dallas and bring him back to San Antonio. She testified that she was running a roadhouse and part of the time two roadhouses in or near San Antonio, and that Schmitz operated a slot machine in one of these roadhouses and sold whisky, and that she and Schmitz divided the profits. She also testified that she bought him cars, and gave him money upon numerous occassions, and that he lived with her in such relationship from about the 8th of January, 1930, until sometime in September, 1930, when he abandoned her and returned to Dallas.

Albert J. Fierro testified that after his third marriage to Rachel she repeatedly, when angry, informed him that she had been married to Schmitz, and that Schmitz was her husband, and that upon one occasion upon returning to her home after a week's vacation he found Schmitz in the house, and that Schmitz then claimed to be her husband.

In support of their contention that a common law marriage existed between these parties, defendants introduced in evidence an application to remove disabilities of marriage filed in the district court of Bexar county, Texas, on November 29, 1930, by Rachel Schmitz, which recited that Rachel was the wife of Schmitz, having been married to him on January 8, 1930; that she was about to inherit separate property in her own right, being a portion of the estate of Ida von Blucher, who had died in Germany; that she had been permanently abandoned by her husband, and prayed that the court make an order granting her permission to make all the necessary conveyances, powers of attorney, releases and other instruments as might be necessary in settling up the estate of Ida von Blucher, without her said husband joining therein. This application was sworn to by Rachel. Upon this application the district court of Bexar county made an order empowering Rachel Schmitz to make such conveyances and execute such instruments as might be necessary in the settling of said estate without being joined therein by her husband. Defendants also produced and introduced in evidence a warranty deed dated April 12, 1930, made by Rachel Blucher Atkins Schmitz and husband Ford A. Schmitz, conveying certain property in Nueces county, Texas, said deed being signed by Rachel and Ford A. Schmitz, and separately acknowledged by Rachel as required by the laws of Texas. The acknowledgment by Rachel also recited that she was the wife of Ford A. Schmitz.

Defendants also produced and introduced in evidence another warranty deed reciting "that I, Rachel Blucher Atkins Schmitz, joined herein by my husband, Ford A. Schmitz" conveyed certain real property to one J. B. Hubbard, which deed was executed by both Rachel and Ford A. Schmitz, and acknowledged by Ford A. Schmitz and wife, Rachel Blucher Atkins Schmitz. This instrument was also separately acknowledged by Rachel, the acknowledgment reciting that she was the wife of Schmitz.

They also introduced an assignment of a vendor's lien note, which in both the body of the assignment and the acknowledgments recited that Rachel and Ford A. Schmitz were husband and wife. Both of these last mentioned instruments were made in June, 1930. Rachel attempted to explain the execution of all these instruments by saying that they were executed at the insistence of a cousin of hers who was looking after her affairs, and who did

not like Schmitz and was afraid of him, but the cousin in his testimony denied that such was the case.

Defendants also introduced in evidence a copy of an indictment returned in the United States District Court for the Western District of Texas on May 5, 1930, against Rachel Schmitz, alias Rachel Fierro, Ford A. Schmitz, and George Scott, for having in their possession certain intoxicating liquor, the indictment reciting that this was the second offense committed by said Rachel Schmitz, and a copy of the proceedings had upon said indictment showing that the court ordered that this prosecution be dismissed as to the defendants, Rachel Schmitz, alias Rachel Fierro, and George Scott.

Defendants also by deposition took the testimony of one Bond, who married Rachel in April, 1932. Bond testified that Rachel told him that she had been married before; that he remembered the names of three of her husbands, that one was named Atkins, one Fierro and one Schmitz, and that she represented herself as being single when she married him.

At the time of the alleged common law marriage between Rachel B. Atkins and Ford A. Schmitz they were residents of the State of Texas, and the validity of their marriage must be determined by the laws of that state. 38 C. J. p. 1276, §3; 55 C.J.S. p. 811, §4. The decisions of the State of Texas governing the validity of common law marriages, and stating their essential requirements, were pleaded and proven, and in the briefs of the respective parties many Texas decisions upon this subject are cited and discussed. Since the essentials of common law marriage seem to be well settled by the decision in that state, we consider it unnecessary to cite and discuss any large number of the Texas decisions upon that subject. In Berger v. Kirby, 105 Tex. 611, 153 S. W. 1130, the rule which seems to have been uniformly adopted in Texas with reference to common law marriage is stated as follows:

"A common-law marriage is valid in this state, and the issuance of a marriage license or marriage ceremony is not necessary to constitute a common-law marriage. A common-law marriage exists when a man and woman enter into an agreement to become husband and wife, and in pursuance of such agreement do live together and cohabit as husband and wife, and hold each other out to the public as husband and wife. Such agreement to become husband and wife may be express or implied. An express agreement is where the parties thereto expressly agree; and an implied agreement is where the parties with reference to the subject-matter is such as to induce the belief in the minds of the contracting parties that they intend to do that which their acts indicate they have done."

Other decisions so holding are Martinez v. Martinez (Tex. Civ. App.) 6 S. W. 2d 408; McChesney v. Johnson (Tex. Civ. App.) 79 S.W. 2d 658; Hill v. Smith (Tex. Civ. App.) 181 S.W. 2d 1015; and Aldana v. Aldana (Tex. Civ. App.) 42 S.W. 2d 661.

Consideration of the evidence as above outlined, in the light of the requirements of the Texas law as above set forth, convinces us that the finding and judgment of the trial court in the instant case that a common law marriage did exist between Rachel B. Atkins and Ford A. Schmitz is not clearly against the weight of the evidence. We think the evidence sufficient to establish an express agreement, a mutual consent, between these parties to become husband and wife, and to show that they so held themselves out to the public. There is no dispute as to the fact of their cohabitation.

An indication of the fact that the brothers and sisters of Schmitz understood or believed that such relationship existed is shown by the fact that when Schmitz was in Dallas and would become drunk and unruly they would call Rachel to come and get him, and that she would do so, which she admitted happened on several occasions. But the most important indication of such relationship and the holding out

of the parties to the public that such relationship existed is evidenced by the deeds and assignment of vendor's lien notes executed by them as husband and wife, and by the application of Rachel to remove the disabilities of marriage between her and Schmitz so that she could execute various instruments in connection with the German estate without being joined therein by her husband. All of these were solemn admissions or declarations to the public of the existence of the marriage relationship.

In Aldana v. Aldana, supra, the Texas court stated that declarations and admissions of the husband and wife are generally admissible to prove or disprove their marriage, if made during the cohabitation of the parties. The court said:

"The true test for the admission of the declaration of a deceased person is whether such declaration was made under circumstances justifying the conclusion that there was no probable motive to falsify the fact declared, such as the existence or nonexistence of a controversy at the time of such marriage relation."

In DeBeque v. Ligon (Tex. Com. App.) 292 S.W. 157, the Texas court held that an instrument of adoption describing the parties as husband and wife, although the evidence showed that they had been theretofore divorced for business reasons, and the wife had executed numerous deeds and instruments as a single woman, was of great significance in that although the parties ostensibly held themselves out to the public as single, they expressly recognized and declared therein the existence of the marriage relation between them.

In Re Seymour, 185 N. Y. S. p. 373, 377, involving the question of whether or not the parties were common law husband and wife, the New York court, referring to a deed made by the parties which recited that they were husband and wife, stated that such deed was "a solemn acknowledgment by the said Seymour made to the world that this woman was his wife."

In Linsey v. Jefferson, 68 Okla. 156, 172 P. 641, we held that repeated acknowledgments by a man, since deceased, of his marriage to a certain woman were direct evidence of such marriage. Referring to such declarations we said:

"Of course, the value of declarations of the parties concerning marriages must always depend upon the circumstances under which they were made, but when, as here, there was not only repeated oral acknowledgments of the status by both parties, but also declarations to that effect made by the man under oath in circumstances of greatest deliberation, such declarations, as we have seen, are entitled to great weight. 8 Enc. Ev. 476; Greenawalt v. McEnelly, 85 Pa. 352."

To the same effect is Coleman v. James, 67 Okla. 112, 169 P. 1064, which is cited with approval in Linsey v. Jefferson, supra, and Vann v. Vann, 186 Okla. 42, 96 P. 2d 76.

In Re Milton's Estate, 182 Okla. 625, 79 P. 2d 612, Milton, who had theretofore been divorced from his wife, contested her will on the ground that after the divorce he had contracted a common law marriage with her and was her husband at the time of her death. Pending the proceeding in the will contest Milton died, leaving a last will and testament executed prior to his divorced wife's death, in which he made provision for an ex-wife, but made no provision for an existing wife. Speaking of this will and its value as evidence, this court said:

"The evidence of the parties with reference to the relations existing between Ned J. Milton and Cassie H. Milton subsequent to their divorce in November, 1925, was in conflict in many respects, but it clearly discloses that as late as February 21, 1934, when Ned J. Milton made his last will and testament that he did not then consider himself married to any one, since he made provision in his will for an ex-wife rather

than any existing wife, although Cassie H. Milton was then living. This in our opinion outweighs all of the evidence respecting reputation and shows a clear absence of any matrimonial intent in any of the relations existing between the parties after their divorce."

The rule announced in these decisions seems to be the general rule. 38· C.J. p. 1336, §109; 55 C.J.S. p. 900, §44 (d). The fact that Rachel was prosecuted in the federal court under the name of Rachel Schmitz, along with Ford A. Schmitz and another individual, and her admission that she used that name in her business transactions, is evidence that she assumed and was known by that name while living with Schmitz.

Plaintiffs contend that the presumption of a common law marriage, founded simply upon habit and repute is overcome by a subsequent actual marriage between one of the parties to the common law marriage and a third party, citing Walton v. Walton (Tex. Com. App.) 228 S.W. 921; In re Blackhawk's Estate, 195 Okla. 390, 158 P. 2d 168, and other cases so holding. Defendants assert that the presumption contended for applies only to the last marriage, and that the burden rested upon plaintiffs to prove not only the validity of the third marriage between Albert J. Fierro and Rachel ·B. Atkins, but to further prove that at the time they were married both were competent to enter into the marital relationship, citing Roberts v. Roberts, 124 Fla. 116, 167 So. 809; Routledge v. Githens, 118 Ore. 70, 245 P. 1072; 45 A.L.R. 922, and other cases in support of this assertion. We deem it unnecessary to definitely determine whether such presumption obtained, or upon whom rested the burden of proof to establish.the validity or invalidity of the third marriage between 'Albert J. Fierro and Rachel B. Atkins. If the presumption obtained, as contended by plaintiffs, the evidence ·in the instant case, which; under the authorities above cited, constituted direct evidence of the relationship of husband and wife· existing between Ford A.

Schmitz and Rachel B. Atkins, was sufficient to overcome any presumption that Rachel, at the time of her third marriage to Albert J. Fierro, was competent to enter into that relationship, and was sufficient to show that under the laws of the State of Texas ˈshe was in truth and in fact the common law wife of Ford A. Schmitz when she attempted to marry Fierro a third time. The solemn admissions of the parties in the recorded instruments executed by them, and the application of Rachel to have the disabilities of matrimony removed, all constitute direct and positive admissions of the matrimonial status of the parties to the common law marriage, and are not in any wise overcome by any testimony in the record to the contrary.

Our decision upon this question renders it unnecessary to decide the other questions presented by the parties. The finding of the trial court that Rachel and Schmitz were man and wife under the common law, at the time Rachel embarked upon her third matrimonial venture with Fierro, and that she therefore was not competent to enter into a valid marriage with him at that time, and its further finding that because of the invalidity of said third marriage Fierro was competent to marry Mo-se-che-he, are not clearly against the weight of the evidence, and must be sustained.

Affirmed.